**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3753-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

SCOTT A. KOLOGI,

     Defendant-Appellant.

_____

> Argued January 16, 2025 – Decided January 30, 2025
>
> Before Judges Mawla, Natali, and Walcott-Henderson.
>
> On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 20-01-0067.
>
> Emeka Nkwuo argued the cause for appellant (Lomurro, Munson, Comer, Brown & Schottland, LLC, attorneys; Emeka Nkwuo, of counsel and on the briefs).
>
> Monica do Outeiro, Assistant Prosecutor, argued the cause for respondent (Raymond S. Santiago, Monmouth County Prosecutor, attorney; Lisa Sarnoff Gochman, Assistant Prosecutor, of counsel and on the brief; Monica do Outeiro, on the brief).

PER CURIAM

Defendant Scott A. Kologi appeals from his convictions and sentence on four counts of first-degree murder, N.J.S.A. 2C:11-3(a)(1); and one count of second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a). We affirm.

On December 31, 2017, defendant's family gathered at their residence in Long Branch for a New Year's Eve celebration. In addition to defendant, present were defendant's mother, father, brother, his brother's girlfriend, sister, aunt, uncle, grandfather, and his grandfather's girlfriend.[1] As midnight approached, defendant's mother went upstairs to get defendant, who had gone to his room. At that point, there was a "pop[ping]" noise and a "groan." Defendant's father ran upstairs, while everyone else scattered. The aunt and uncle ran downstairs and exited through the basement door. Defendant's brother exited through the front door. His girlfriend ran to the kitchen and joined the grandfather, grandmother, and defendant's sister. There were more popping noises after defendant's father ascended the stairs and bullet holes appeared in the ceiling.

_____

[1] Defendant considered his grandfather's girlfriend to be his grandmother. We will refer to her accordingly.

2

Defendant then walked down the stairs holding a rifle and wearing a "Terminator" costume described as a black jacket and sunglasses. He had not been wearing the costume earlier in the evening. Defendant wore earplugs and looked "stern" and "cold"; he did not scream and was unemotional. He then walked through the living room and into the kitchen, where he shot the grandmother and his sister. His brother's girlfriend hid behind the refrigerator and called 9-1-1. Defendant did not shoot his grandfather or the brother's girlfriend. Instead, he put the rifle down and walked away. Defendant's brother remained outside the residence and watched the incident through a window. He then moved away from the house and called 9-1-1.

Police arrived shortly after the 9-1-1 calls. Knowing the shooter was still inside the house, and believing the threat was still active, they entered the residence in formation and saw a male lying at the bottom of the stairs. The male was not moving and had a head wound. Police then heard another male voice say, "I'm upstairs." They ordered the male, later identified as defendant, to show his hands and he complied. Defendant came to the landing, and said, "I don't have the rifle." Police then instructed defendant to go to the top of the stairs, and they then ascended the stairs and took him into custody. They asked defendant where the rifle was, and he told them it was "behind him." Police

then began to search the second floor and found defendant's mother lying in the hallway outside of a bedroom, deceased. They also found the rifle with one bullet in its chamber. Additionally, police recovered a bookbag, which held another full set of bullets in a magazine, and defendant's cell phone.

Despite efforts to save defendant's father, he succumbed to his injuries. He had been shot three times in the torso and once through the top of his head. A medical examiner on scene observed defendant's mother had been shot five times. His grandmother had been shot one time and his sister was shot in the head and chest while sitting in a kitchen chair.

Of the fourteen shots fired, twelve hit the victims. The murder weapon was an "American Variant AK-47" rifle, belonging to defendant's brother, which he had acquired approximately one year prior. On the night of the incident, the rifle was not in a safe, but in the closet of the bedroom defendant shared with his brother. The brother explained he stored the rifle outside the safe because the safe had begun to rust the rifle. He told police he had two magazines for the rifle and stored the rifle in the closet without a magazine. The bullets were also stored separately from the magazines.

Monmouth County Prosecutors Office Lieutenant Andrea Tozzi was the lead investigator on the case. When she learned the Long Branch Police

Department had a suspect in custody, she immediately went to the police station. After she arrived, a decision was made to speak to the suspect, whom Lieutenant Tozzi learned was sixteen-year-old defendant. Due to defendant's age and the nature of the incident, the detective asked the brother, who witnessed the shooting, if he would be willing to serve as defendant's guardian and give permission for her to speak with defendant. The brother, who was twenty years old, agreed to both requests. The interview with defendant and his brother was audio and video recorded. At the outset, investigators read defendant his Miranda[2] rights, which he agreed to waive.

Investigators gathered background information about defendant, including his education plans, extracurricular activities, and social life. When investigators asked what happened earlier that night, defendant responded that he would "see or hear . . . stuff that wasn't there." Defendant spoke of "two instances" of hearing things. Once, "when [he] was younger," he heard a voice on the stairs. Another time, he thought he saw a "pinkish mass" staring out from his neighbor's house. On another occasion he thought he saw a "transparent woman" floating into his bedroom ceiling while he was trying to fall asleep, and

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

a similar figure on the neighbor's roof. Defendant thought he saw "red faces" on a wall in his house.

As for the night of the shooting, defendant said he did not "really know" if he saw or heard anything. However, he had "thought" for "like a year" about "hurt[ing]" his family and told his grandfather about those thoughts. Defendant told detectives he "d[idn]'t know" how he felt earlier that evening. He was sitting downstairs with his family, getting ready to celebrate the new year, then went upstairs to work on a school project, and started thinking about "stuff [that] happened" with his "neighbor" and other "bad moments" at school. Things "buil[t] up" and suddenly, "everything c[ame] together and [he] was just like tired of it." He retrieved the rifle from the closet, got the bullets, loaded both magazines and put one in the rifle. While loading the rifle, defendant said he was "questioning it, but . . . couldn't . . . stop it. Like it was something subconscious[], like [he] had to do it." As to why he loaded both magazines, defendant said he "probably would have went out and . . . continued doing it."

Defendant told detectives it was the first time he used a rifle, and before that night, he watched videos on how to handle the weapon. He wore the Terminator costume "because . . . that's the jacket [he] wear[s]." Defendant said he wore the earplugs to muffle the noise of the rifle.

6 <span>A-3753-21</span>

Shortly before the shooting, defendant said he heard his mother call for him, but he was "shutting off" "like it wasn't [him] really." As he was shooting, he was not scared and did not have an "emotional response . . . it was like [he] was watching a movie." Defendant admitted shooting his mother, father, grandmother, and sister, in that order, and when he saw his grandfather, "that confused [him]" and "got [him] out of [his] daze." He said he also heard his brother's girlfriend call the police, and at that point, he "shook [his] head" and went back upstairs. Defendant knew the police were on their way and he "d[idn't] want to get shot," so he put the rifle "to the side."

Defendant asked investigators if he could be put into a "mental institution." When they asked if he knew the difference between right and wrong, he responded that he did. He then said that while he cared for his family, he had no feelings after the incident. Defendant added he knew his mother, father, grandmother, and sister were dead because he kept shooting until they stopped moving.

Defendant told investigators he purposely turned the lights off in his room because he did not want his mother to look at him or be "snapped . . . out of it." He reiterated the thoughts about hurting his family started a year or two prior to

the incident, and earlier that day, he was thinking about getting his brother's rifle and shooting it.

Defendant confirmed he did not see anything or hear any voices the night of the incident, but then claimed he saw a white light outside the window earlier that evening, which then disappeared. Investigators asked defendant if he had any pets, and he responded he had a cat and a dog. When they asked why he did not shoot the dog, defendant answered "[h]e wasn't doing anything to me."

A search of defendant's cell phone revealed an internet search at 7:32 the night of the incident about whether a bullet from an AK-47 could pierce body armor. Another search on defendant's phone at 7:43 was for "preparation theme music." Investigators found another search also at 7:43 for "London terror rampage hoax flat earth concerns," which revealed information regarding a 2017 terrorist attack in London.

Two medical examiners testified for the State at trial. One doctor examined defendant's father and sister. He observed a gunshot wound to the top of the father's head. The bullet traveled downward and out the midline of the father's jaw. Defendant's father also had gunshot wounds to the upper back and left upper arm. The doctor concluded the father's cause of death was multiple gunshot wounds, any of which "could have been fatal in-and-of themselves."

Defendant's sister had a gunshot wound to her cheek and left upper chest. Her cause of death was also the gunshot wounds, either of which had the "potential to be fatal."

The second doctor examined the grandmother and the mother. The grandmother suffered a gunshot wound to her left wrist and a fatal gunshot wound to her abdomen. The mother's cause of death were multiple gunshot wounds to her neck, jaw, collarbone, upper shoulder, chest, and right upper arm.

Defendant's brother testified that although he shared a room with defendant, defendant slept with their parents. The brother said defendant had special needs, but he was unsure what they were. Defendant did not act the same age as his peers and attended a school for special needs students. According to the brother, the family believed defendant had a brain tumor, which had the potential to get worse, and that the brain tumor was the reason for defendant's developmental delays. Defendant kept "to himself a lot," read books, watched television, or played video games. He was "very isolated" and did not have many friends. However, defendant never spoke with his brother about seeing things or hearing voices.

Defendant's aunt testified she resided with the uncle in the basement of the family home. Following the incident, she spoke with investigators at the

9

police station and explained her sister did not want her to talk about defendant to anyone. The aunt was worried her sister would kick her out of the house if she did. She relayed that during a car trip with defendant and her sister, defendant told his mother he "want[ed] to talk to the shrink" at school because he was having "bad thoughts" about "[h]urting . . . the neighbor['s] kid."

The aunt testified she returned to the police station on January 2, 2018, to tell investigators that defendant wanted to seek help, but her sister was preventing him. She said the conversations about defendant having bad thoughts about hurting people happened on more than one occasion, and seemingly occurred whenever he was having a "bad day." However, defendant's mother would just "brush" these discussions off. The aunt told investigators about an incident in October 2017 where she and her husband were playing a board game with defendant, and he picked up a gun shaped game piece and "joking[ly]" said that he was going to kill them.

After the murders, the aunt called and visited defendant in jail. During one conversation, she asked him why he killed his family members, and he replied she would have to read his book, which he intended to call "Scott-Free." She testified defendant never spoke with her about hearing or seeing things. She also believed defendant suffered from a brain tumor.

The defense presented several witnesses, including defendant's eldest brother, the uncle, his paternal grandmother, and psychological expert Dr. Maureen Santina. The eldest brother was not present for the shooting, but testified he stopped by the family home earlier in the day on New Year's Eve. He recalled everyone appeared happy, including defendant, whom he described as appearing "normal." He confirmed defendant slept in bed with his parents every night and still believed in Santa Claus.

The uncle said he never saw defendant get violent and never heard of him getting into fights. There was nothing "out of the ordinary" regarding defendant or his behavior on New Year's Eve.

The paternal grandmother echoed the uncle's testimony, explaining she never saw defendant display any violent tendencies. She also testified defendant did not have any friends; did not form relationships with others at school; and was bullied when he was younger, which was why he did not attend public school.

Dr. Santina evaluated defendant in February 2019 and issued a report the following month at the request of his guardian ad litem. The purpose of the evaluation was to determine whether defendant needed treatment. She opined

11

he presented as socially awkward and stilted.  Although his voice and emotions were flat, he held a positive view of his parents.

Dr. Santina testified about the "odd perceptual experiences" defendant detailed during his evaluation.  She noted they were like the ones he described to investigators in his interview following the incident.  For the first time, however, defendant revealed that on the day of the murders he heard a voice while he was in the shower, which said:  "[W]elcome to the side of evil."

Dr. Santina concluded that at the time of the shooting, defendant was experiencing a "dissociative episode," and was feeling detached from his actions.  This was supported by the fact defendant had "snapped out of it" after he shot his sister.  Dr. Santina opined defendant had early onset schizophrenia, which in part produces dissociative episodes.  Although she did not form an opinion on defendant's state of mind during the incident, she opined that before the shooting defendant "was showing evidence of psychotic symptoms, schizophrenic symptoms."  However, she did not recommend any sort of medication or treatment for schizophrenia.

Defense counsel requested Dr. Santina perform a second evaluation, which took place in November 2020.  In addition to the information considered for the initial evaluation, Dr. Santina testified she reviewed the State's

12

discovery; interviewed defendant's eldest brother; and reviewed statements from the aunt, grandfather, the brother who was present for the shooting, and his girlfriend. Dr. Santina also reviewed defendant's Individualized Educational Plans (IEPs). One IEP contained a family history showing the grandfather was diagnosed with schizophrenia, the maternal grandmother was diagnosed with multiple personality disorder and borderline personality disorder, and the sister was diagnosed with bipolar disorder. Defendant's own classification at school was "multiple disabilities."

Dr. Santina noted a 2011 evaluation, which stated defendant was "showing symptoms" of attention-deficit/hyperactivity disorder (ADHD) and had a "brain anomaly." However, the anomaly was not an official medical diagnosis. The evaluation also reported the brother who was present for the shooting was diagnosed with autism. Dr. Santina did not diagnose defendant with autism.

Dr. Santina opined defendant's IEP was based on the ADHD diagnosis, the presence of a benign brain tumor, and various developmental delays. She conceded all the information regarding the alleged tumor came from one of defendant's family members and was not presented as an official medical diagnosis.

During the second evaluation, defendant talked about an increase in hearing and seeing things about one year prior to the shooting, and that the hallucinations intensified approximately two months prior to the shooting. Concurrently, defendant said he felt like "people might hurt him," particularly neighbors and family members. Defendant told Dr. Santina he experienced "impulses" that he repeatedly tried to suppress. He claimed he wanted to talk to a professional, but his mother discouraged him.

Dr. Santina opined defendant was experiencing "growing paranoia" and on the day of the shooting he was "flooded" with "thoughts that he did not want to have." She testified that when defendant saw the light outside his window just prior to the shooting, he then went into "autopilot," and was "out of contact with reality and was being dominated by . . . his mental health symptoms." Defendant was not released from his dissociative state until he saw his grandfather and stopped shooting. At this point he was confused, wondering how the shooting occurred.

Dr. Santina reached the same conclusion as in her first evaluation: defendant was suffering from early onset schizophrenia. She explained schizophrenia and autism have similar presentations, especially in early childhood, but as a person ages, the symptoms become more debilitating for

schizophrenics. At the time of the shooting, defendant was "laboring under the mental disease of schizophrenia . . . and . . . was actively in a psychotic state and in a . . . dissociative state." She concluded defendant suffered from insanity at the time of the shooting.

The State presented expert testimony from a forensic psychiatrist, Dr. Park Dietz. The doctor evaluated defendant and issued a report in October 2021. Unlike Dr. Santina's evaluations, Dr. Dietz audio and video recorded his evaluation of defendant, and several clips were played for the jury. Dr. Dietz explained a "video recording is the only way . . . to capture all of the behavioral evidence."

Dr. Dietz diagnosed defendant "as having an autism spectrum disorder." He opined defendant "does not have schizophrenia" and "never had schizophrenia." Nor did defendant have an intellectual disability. However, Dr. Dietz agreed that "at least for a period of time on the day of the incident, . . . defendant entered a kind of dissociative state known as depersonalization," which is "an attentional state" where an "individual may feel that they are watching themselves from a distance, or from above." He noted that many activities can result in a dissociated state, and "[t]here doesn't have to be any pre-existing mental disease or defect . . . to experience dissociation." Dr. Dietz

15

opined that during the shooting, defendant "did know and appreciate the nature and quality of his actions" and "did know and appreciate the wrongfulness of his actions," as proven by defendant's statement to investigators showing no evidence of amnesia.

Dr. Deitz reviewed defendant's school records, which showed defendant was experiencing anxiety about the potential move from his school. Prior to enrolling in the special needs school, defendant experienced bullying in public school, and it was still a major concern for defendant.

Dr. Dietz also considered a text message defendant's brother, who witnessed the murders, sent to their mother on October 1, 2017, stating "grandpa says all [defendant] talks about is killing people." Additionally, the aunt recounted a conversation defendant had with his mother about killing members of his family, and specifically, who, in what order, and why he would do so, and defendant asked his mother: "Why can't I tell the shrink about killing the family?" Dr. Dietz testified this information was significant because defendant gave specific reasons why he would harm certain family members. It was also important that the same information came from more than one source and was therefore corroborated.

16

Dr. Dietz explained defendant's comments and behavior following the shooting were an attempt to explain his conduct by blaming it on something other than himself. Defendant continued to tell others about his brain tumor and attributed symptoms to it, yet he had no brain tumor. Dr. Dietz concluded nothing defendant said could be taken "at face value" because he was "struggling to find a way to account for [the shooting]."

Based on Dr. Dietz's review of the record, no one in the family, including the grandfather, had schizophrenia. Defendant's autism diagnosis was supported by the fact that he lacked relationships with peers, his comfort with adults, and his gullibility, susceptibility to bullying, difficulty with eye contact, inappropriate affect, and evidence of obsessive compulsiveness.

The recording of Dr. Dietz's evaluation with defendant showed that when defendant was left alone, he spoke to himself, but when the doctor returned defendant immediately stopped talking. The doctor opined this evidenced that talking to himself was a voluntary behavior. Dr. Dietz also noted defendant could not remember what the voice in the shower told him the day of the shooting and referred the doctor to the report from his previous evaluator to see what was said.

A-3753-21

Dr. Dietz opined defendant's "obsessive compulsive disorder[,] which is part of his autism spectrum disorder[,] led him to obsess" over the possibility of returning to public school and the past bullying he experienced, causing a "build[-]up of tension that he wanted to be done with." Defendant's descriptions of the voices he heard were not like the "hallucinatory experiences of those with schizophrenia." The first-time defendant reported schizophrenia and cognitive dissonance was after a visit from his brother. At no time following the shooting was defendant given any medication. The doctor concluded defendant did not meet the diagnostic criteria for schizophrenia.

Dr. Dietz emphasized that dissociative and psychotic states are not the same. Whereas dissociative states "occur for quite a number of reasons and do not require that the person have any illness or any disease. Psychotic states only occur under very specific conditions and are abnormal." Dr. Dietz opined "firing that first shot is the drama that initiated the dissociation that persisted throughout most of the shooting and may have ended when he chose not to kill his grandfather." Dr. Dietz did not believe defendant was experiencing a psychotic episode because he took deliberative actions, including turning his bedroom lights off and wearing earplugs. He concluded defendant was sane at the time of the murders.

18

Defendant raises the following points on appeal:

POINT I

THE LOWER COURT ERRED IN DENYING [DEFENDANT'S] MOTION TO SUPPRESS HIS STATEMENT.

A. THE LOWER COURT ERRED IN DENYING [DEFENDANT'S] MOTION TO SUPPRESS HIS STATEMENTS BECAUSE [DEFENDANT'S BROTHER] HAD A CLEAR CONFLICT OF INTEREST AND COULD NOT SERVE AS DEFENDANT'S GUARDIAN[] UNDER THE CIRCUMSTANCES.

B. THE TRIAL COURT ERRED IN FINDING THAT AFTER ASSESSING THE TOTALITY OF THE CIRCUMSTANCES THAT [DEFENDANT] GAVE A KNOWING, INTELLIGENT AND VOLUNTARY WAVIER.

a. The Trial Court Erred in Finding that the Defendant's Waiver was Knowing, Intelligent, and Voluntary and did not put Appropriate Weight on the Fact that the Defendant did not have an Opportunity to Consult with his Guardian in Private Prior to the Interrogation.

b. The Trial Court Erred in Finding that Defendant's Waiver was Knowing, Intelligent, and Voluntary and did not put the Appropriate Weight on the Fact that the Detectives Gave Incorrect Miranda Warnings to [Defendant].

19

c.	The Trial Court Inappropriately Shifted The Burden On The Defendant To Establish That His Waiver Was Not Knowing, Intelligent And Voluntary.

d.	The Trial Court Erred in Finding That [Defendant] Did Not Make An Ambiguous Assertion Of His Right To Remain Silent Prior To Questioning.

POINT II

THE JURY SELECTION PROCESS VIOLATED THE RIGHTS AND PROTECTIONS AFFORDED TO . . . DEFENDANT BY OUR SUPREME COURT'S ORDERS, JUDGE GRANT'S DIRECTIVES, AND THE SIXTH AMENDMENT.

POINT III

THE CUMULATIVE EFFECT OF THE PROSECUTORIAL MISCONDUCT MANDATE THAT [DEFENDANT] BE GRANTED A NEW TRIAL.

a.	Trial Court Erred by Not Granting a Mistrial when the Prosecutor said "This is Murder" in her Opening Statement.

b.	The Prosecutor committed Prosecutorial Misconduct by insinuating that [Defendant's Aunt] was lying on Direct Examination.

c.	The Prosecutor committed Prosecutorial Misconduct by Excessively Disparaging the Defense Expert in his Closing Argument.

20

d.     The Prosecutor Committed Prosecutorial Misconduct by Insinuating in the Closing Argument that Doctor Santina was a Treating Doctor who Fabricated her Initial Evaluation.

e.     The Prosecutor Committed Prosecutorial Misconduct by Questioning Dr. Santina about a Defense Expert Report Used at the Waiver Hearing.

f.     The Prosecutor Committed Prosecutorial Misconduct by Telling the Jury that [Defendant] was Lying and Improperly Expressed his Personal Opinion as to the Veracity of Witnesses in the Prosecutor's Summation (Not Raised Below).

POINT IV

A NEW TRIAL IS WARRANTED BASED UPON THE COURT'S COMMENTS AND INTERRUPTIONS DURING DR. SANTINA'S EXPERT TESTIMONY (NOT RAISED BELOW).

a.     [Defendant] was Prejudiced During his Trial because during the Defense Expert's testimony, the Court consistently interrupted the Defense Expert and did not Interrupt the State's Expert in the Same Fashion (Not Raised Below).

b.     The Court Prejudiced [Defendant] by Allowing Dr. . . . Dietz to Testify about the Legal Definition of Insanity.

POINT V

[DEFENDANT'S] CONVICTION SHOULD BE OVERTURNED BECAUSE THE COURT ALLOWED

21

THE PROSECUTOR TO [INTERJECT] EXCESSIVE AMOUNTS OF HEARSAY INTO THE CASE THROUGH EXPERT TESTIMONY (Partially Raised Below).

    a.    The State Argued Inadmissible Hearsay Elicited by Dr. . . . Dietz as Substantive Evidence in the State's Closing Argument (Partially Raised Below).

POINT VI

[DEFENDANT'S] CONVICTION SHOULD BE OVERTURNED BECAUSE THE COURT ALLOWED DR. DIETZ TO TESTIFY IN DEPTH REGARDING THE ULTIMATE ISSUE AND THE VERACITY OF WITNESSES IN THE CASE.

    a.    [Defendant] was Prejudiced by the Court allowing Dr. . . . Dietz to Opine on the Veracity of Witnesses[] Testimony (Not Raised Below).

POINT VII

THE JURY [CHARGE] DID NOT CORRECTLY [INSTRUCT] AS TO THE RELEVANT LAW AND WAS MISLEADING WARRANTING A NEW TRIAL.

POINT VIII

[DEFENDANT]'S SENTENCE WAS MANIFESTLY EXCESSIVE AND THE COURT INAPPROPRIATELY [WEIGHED] THE AGGRAVATING AND MITIGATING FACTORS.

A-3753-21

POINT IX

THE COURT IMPROPERLY APPLIED THE MILLER[3] FACTORS.

POINT X

THE COURT ERRED IN IMPOSING CONSECUTIVE SENTENCES.

I.

In point I, defendant argues the trial judge erred in denying the motion to suppress his statement to investigators on grounds his brother had a conflict of interest and could not serve as his guardian during the police interrogation. Even if his brother could serve as a guardian, defendant claims he did not have the chance to privately consult with him. Defendant alleges investigators gave him "incorrect Miranda warnings" and he "did not understand his right to have an attorney present before and during questioning." He claims the judge erred when he found defendant did not assert the right to remain silent before questioning and concluded the Miranda waiver was knowing, intelligent, and voluntary.

Lieutenant Tozzi testified at the Miranda hearing and recounted the facts of the interview as we have stated them. The video of the interview captured

---

[3] Miller v. Alabama, 567 U.S. 460 (2012).

A-3753-21

the brother's agreement to serve as defendant's guardian. The brother then asked investigators if he could have time alone with defendant to tell him to "tell the truth." Although investigators did not leave the brothers alone in the interrogation room, they showed the brother the <u>Miranda</u> form and said they would bring defendant into the room, go over the <u>Miranda</u> form with them, and give them time to speak to each other.

Defendant was then brought in and was asked some questions about his age and schooling. He responded that his grades at school were good and expressed he was trusted with various jobs at school. Investigators then explained defendant's <u>Miranda</u> rights and their significance. They reviewed each question on the <u>Miranda</u> form and paused after each question to ensure defendant understood. Defendant also read each question aloud to himself. Investigators asked the brother if he understood each of the rights, and he responded affirmatively. After reviewing the form, detectives asked defendant if he wanted to speak with them. He responded that he did and signed the <u>Miranda</u> form.

As defendant signed the form, his brother told him that "everyone still loves" him and instructed defendant to tell the detectives everything. He told defendant, "[w]e've all got your back."

Thereafter, investigators asked defendant questions regarding his school, hobbies, and social life. Then they pivoted to the shooting. Defendant responded he did not "want to tell [them] that much."

Defendant then began telling investigators about imaginary things he had seen and heard when he was younger. They asked him if he saw or heard anything the evening prior to the shooting, and defendant said he did not "really know." Defendant then talked about the past year and "thoughts" he previously had about "hurt[ing his] family."

Defendant detailed what happened the evening of the shooting, including the thoughts he had beforehand, the rifle and how he loaded it, and what he wore. He described "shutting off" when he heard his mother's voice. When investigators asked what happened after his mother came upstairs, defendant said he "d[idn]'t like to talk about it" and that the "rest is history." However, he continued talking and described the shooting felt like "watching a movie." He described the shootings and how he later snapped back into reality, returned upstairs, and waited for police to arrive.

Investigators asked defendant how he was currently feeling, and defendant said he wanted to go to a mental institution. He did not feel emotional and told them it just is "another day for [him]." Defendant said he got along with his

A-3753-21

parents "really well" and they were good parents, and he got along with his sister. He explained he shot his mother "five to seven" times, then he shot his father, shot his sister three times, and shot his grandmother four times. Defendant kept shooting at them until they stopped moving.

The interview stopped because defendant asked to use the bathroom. His brother remained behind with Lieutenant Tozzi, and he began to sob. He said defendant could be "very distant," and he talked to his grandfather a lot. The brother never heard defendant mention that he saw and heard things that were not there.

When defendant returned, his brother had stopped crying and made jokes with him. Defendant continued to talk about the events surrounding the shooting and said he felt nervous when he was loading the rifle because he thought about what would happen after the shooting took place. He said that if his grandfather did not show any emotion, he would have continued shooting, possibly going outside to the neighbors' houses.

Defendant explained why he shut off the light in his room prior to the shooting. He reiterated he began having thoughts about hurting his family about "a year or two ago" and explained those thoughts would come and never leave.

26

He felt like he had to act. Defendant said he had a therapist but never mentioned those thoughts to his therapist before.

Defendant's brother interjected that defendant had always slept with their parents. Defendant again mentioned that he wanted to go to a mental institution. He told detectives about the white light outside his window. Defendant also told investigators he had thoughts in the past of "going a few blocks down" and shooting, but he was tired and decided not to go through with it.

The interview concluded with investigators asking about defendant's pets and him explaining why he did not shoot them. Although defendant clarified he would have shot the dog if it tried to attack him, he liked the dog, his parents, and "everyone."

Lieutenant Tozzi testified that she was aware the brother had witnessed the shooting and was the 9-1-1 caller. She also knew the rifle belonged to him. Several family members were at the police station the night of the shooting, including: the aunt and uncle; and defendant's eldest brother[4] and his fiancé. Lieutenant Tozzi did not try to contact any of defendant's other family members prior to speaking with defendant. She was also unaware defendant had special needs.

---

[4] Lieutenant Tozzi was unaware this man was also defendant's brother.

A-3753-21

The trial judge found defendant had time to consult with his brother, even though the detectives were in the room during the consultation. He found defendant was "responsive, . . . coherent, . . . [and] engaged in the conversation." Although defendant had allegedly seen and heard things in the past, the judge found he was "not suffering from any of them at the time he went through his <u>Miranda</u> rights or at any time during the course of the actual statement." The judge found nothing in the record to support a finding of "any disability that rose to the level of anything to say that this defendant did not have the ability to . . . knowingly or intelligently waive his <u>Miranda</u> rights."

The trial judge concluded defendant was properly advised of his <u>Miranda</u> rights and rejected the defense argument that defendant was merely "yessing" the investigators during the interview. The judge found

> under these circumstances that to ask a law enforcement officer . . . giving <u>Miranda</u> rights, to be able to get into the mind of a defendant when a defendant indicates that they understand their rights and they say yes that they understand them, is beyond the scope of any New Jersey law or any law that this [c]ourt is aware of. . . . [O]n top of the defendant waiving his rights, . . . there is a colloquy about what those rights are. There is an explanation as to what those rights are. And . . . during the colloquy . . . the defendant is engaged in the conversation. He is communicating during the conversation. He is answering questions about things, what they mean in those rights.

28

Defendant "clearly understood what his rights were and that he[,] in understanding those rights[,] . . . was waiving those rights as he knew them."

The trial judge found no conflict of interest in defendant's brother serving as his guardian because the brother was not charged or threatened with charges of any crimes relating to the incident. The brother acted "solely as the brother of the defendant" and "was a suitable guardian to act as a buffer between . . . defendant and the police because [he] was obviously close to [defendant], [and] was acting in [defendant's] best interests when law enforcement asked defendant whether he wanted to waive those rights." The judge noted the brother was "continually supportive" and neither interrogated defendant nor advised him to waive his rights. "He asked him, is this what you want to do. And . . . defendant indicated without reservations, yeah. So[,] I find under these circumstances that [the brother] was . . . an appropriate legal guardian under . . . these unique circumstances . . . because of the other family members' unavailability."

The trial judge found the aunt and uncle were in the same position as the brother, and there was no indication they would have been more suitable guardians for defendant. There was no evidence defendant's eldest brother was available, or an indication of his emotional state.

The trial judge considered the fact defendant and his brother did not consult with one another in private. He also considered defendant's age, lack of a driver's permit, lack of friends or a girlfriend, and sleeping habits. He reasoned there could be many explanations for these circumstances, and they did not necessarily mean defendant was incapable of waiving his Miranda rights. Although defendant attended a special needs school, the judge also considered his classes, grades, various responsibilities, and his post-graduation plans.

The trial judge also found no evidence of prolonged questioning or mental exhaustion. Throughout the interview, defendant appeared to be "alert, awake, [and] responsive." The judge noted investigators spent more than five minutes explaining defendant's Miranda rights to him and made sure he fully understood those rights before questioning him.

The trial judge found defendant was willing to speak and at no point did he invoke his right to remain silent. He concluded defendant knowingly, voluntarily, and intelligently waived his Miranda rights, and denied the suppression motion.

Our scope of review of a suppression hearing is limited. State v. Handy, 206 N.J. 39, 44-45 (2011). We "must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient

credible evidence in the record." Id. at 44 (quoting State v. Elders, 192 N.J. 224, 243 (2007)). "An appellate court 'should give deference to those findings of the trial judge which are substantially influenced by [their] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Elders, 192 N.J. at 244 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). We review a trial court's legal conclusions de novo. State v. S.S., 229 N.J. 360, 380 (2017).

An interrogee may waive their Miranda rights, provided the waiver is made voluntarily, knowingly, and intelligently. State v. O.D.A.-C., 250 N.J. 408, 420 (2022) (quoting State v. Sims, 250 N.J. 189, 211 (2022)). The standard for reviewing the validity of a waiver is strict under New Jersey law. "With respect to the trial court's admission of police-obtained statements, . . . an appellate court 'should engage in a "searching and critical" review of the record to ensure protection of a defendant's constitutional rights.'" State v. Erazo, 254 N.J. 277, 297 (2023) (quoting State v. Hreha, 217 N.J. 368, 381-82 (2014)). The State is required to prove a valid waiver beyond a reasonable doubt. O.D.A.-C., 250 N.J. at 420.

"Beyond the issue of [a Miranda] waiver, there are separate due process concerns related to the voluntariness of a confession. Due process requires the

State to 'prove beyond a reasonable doubt that a defendant's confession was voluntary and was not made because the defendant's will was overborne.'" Ibid. (quoting State v. L.H., 239 N.J. 22, 42 (2019)). "The voluntariness determination weighs the coercive psychological pressures brought to bear on an individual to speak against his power to resist confessing." L.H., 239 N.J. at 43 (citing Dickerson v. United States, 530 U.S. 428, 434 (2000)).

"The due process test takes into consideration the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." Id. at 42 (quoting Dickerson, 530 U.S. at 434). "[T]he factors relevant to the voluntariness analysis include 'the suspect's age, education and intelligence, advice concerning constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature, and whether physical punishment and mental exhaustion were involved,' as well as previous encounters with law enforcement." Id. at 43 (quoting Hreha, 217 N.J. at 383). These "factors are 'assessed qualitatively, not quantitatively,' for 'the presence of even one of those factors may permit the conclusion that a confession was involuntary.'" Ibid. (quoting Hreha, 217 N.J. at 384). An involuntary confession is "inadmissible in evidence regardless of its truth or falsity." Ibid. (quoting State v. Miller, 76 N.J. 392, 405 (1978)).

When an interrogee is a minor, special safeguards apply. See State in the Int. of A.A., 240 N.J. 341, 354 (2020) (holding "[j]uveniles receive heightened protections when it comes to custodial interrogations"). This is because juveniles "are typically less mature, often lack judgment, and are generally more vulnerable to pressure than adults." Ibid. Our Supreme Court has emphasized that "'the greatest care must be taken to assure that' a juvenile's admission is 'voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.'" Ibid. (quoting In re Gault, 387 U.S. 1, 55 (1967)).

A juvenile interrogee has the right to have a parent or guardian present when Miranda warnings are administered. State v. Presha, 163 N.J. 304, 322 (2000). As our Supreme Court has explained, "'[t]he role of a parent in the context of a juvenile interrogation takes on special significance,' because '[i]n that circumstance, the parent serves as advisor to the juvenile, [and] someone who can offer a measure of support in the unfamiliar setting of the police station.'" State in the Int. of A.S., 203 N.J. 131, 147 (2010) (alterations in original) (quoting Presha, 163 N.J. at 314). "Parents are in a position to assist juveniles in understanding their rights, acting intelligently in waiving those

rights, and otherwise remaining calm in the face of an interrogation." Presha, 163 N.J. at 315.

"[T]he mere presence of a parent is insufficient to protect a juvenile's rights . . . ." A.S., 203 N.J. at 148. "In order to serve as a buffer, the parent must be acting with the interests of the juvenile in mind." Ibid. "That is not to say," however, "that a parent cannot advise [their] child to cooperate with the police or even to confess to the crime if the parent believes that the child in fact committed the criminal act." Ibid.; see also State in the Int. of Q.N., 179 N.J. 165, 176 (2004) (finding a juvenile's confession was voluntary even though the mother urged her son to confess and then left the interrogation room).

> Even in cases of . . . apparent clashing interests [between a parent and child], a parent may be able to fulfill the role envisioned in Presha. And, in those cases where a parent is truly conflicted, another adult—not necessarily an attorney—may be able to fulfill the parental assistance role envisioned by Presha . . . [W]hen it is apparent . . . that a parent has competing and clashing interests in the subject of the interrogation, the police minimally should take steps to ensure that the parent is not allowed to assume the role of interrogator and, further, should strongly consider ceasing the interview when another adult, who is without a conflict of interest, can be made available to the child.
>
> [Id. at 154-55 (footnote omitted).]

While "police officers must use their best efforts to locate a parent or legal guardian before beginning the interrogation," the absence of an adult will not automatically render a statement inadmissible, particularly when the interrogee is over the age of fourteen. Presha, 163 N.J. at 315-16. Although "the presence of a parent is a 'highly significant factor,'" A.S., 203 N.J. at 154, an interrogation may still be conducted without parental participation so long as the officers act with "the utmost fairness and in accordance with the highest standards of due process and fundamental fairness." Presha, 163 N.J. at 317 (quoting In re S.H., 61 N.J. 108, 115 (1972); citing State v. R.W., 115 N.J. Super. 286, 296 (App. Div. 1971)).

In A.S., police enlisted the mother of a fourteen-year-old girl, A.S., who was also the victim's biological grandmother, to help during the interrogation process. 203 N.J. at 135-36. A.S. had no experience with the criminal justice system, "low intelligence," and read at a third-grade level. Id. at 149. Police asked the mother to recite the Miranda warnings and did not correct her misstatements. Id. at 136. When A.S. asked whether she had to talk if she had a lawyer, her mother answered, "you . . . have to talk;" "you have to answer." Id. at 139-40. Moreover, the mother openly acknowledged A.S.'s guilt and joined in the interrogation, acting as the police's "helper," "assistant," and

"agent" by aggressively questioning A.S., "badgering" her, "chastising her," and repeatedly calling her "a liar." Id. at 136-37, 141.

Our Supreme Court found the confession was involuntary. Id. at 152. The Court based its decision on A.S.'s young age, low intellectual capacity, inexperience with the criminal process, the incorrect and incomplete explanation of the juvenile's constitutional rights by her mother and police, and inappropriate comments by police regarding answering questions. Id. at 149-52. Rather than consider the mother's presence a conflict, the Court stated "the presence of a parent is a 'highly significant factor' in the totality of the circumstances analysis contemplated by Presha and, generally, that reassuring presence will assist the juvenile in the exercise of [their] rights." Id. at 154-55.

Here, because defendant's parents were deceased, it was logical for investigators to ask his brother if he would be willing to serve as defendant's guardian. The investigators were entitled to rely on the brother's assurances he would be able to serve in the role as defendant's guardian and did not need to seek out any other adult to serve as a guardian for defendant. The record supports the courts's conclusion the brother acted with defendant's best interests in mind. The brother remained calm, supported defendant, and ensured that he understood his rights. He did not join in the interrogation, accuse defendant, or

36

pressure him into a confession. Defendant's rights were not violated by the brother counseling him to tell the truth. The circumstances showed defendant was also not a young child. He attended school; could read and write; received good grades; and had various responsibilities in school.

Police are not required to permit an interrogee and parent to consult privately following the issuance of Miranda warnings. State in the Int. of M.P., 476 N.J. Super. 242, 293 (App. Div. 2023). However, "[i]f law enforcement officers do not allow a parent and juvenile to consult in private, absent a compelling reason, that fact should weigh heavily in the totality of the circumstances to determine whether the juvenile's waiver and statements were voluntary." A.A., 240 N.J. at 359. Conversely, a parent and child should not be "forc[ed]" to consult in private. State in the Int. of A.W., 212 N.J. 114, 134 n.6 (2012). "In light of the multiple possible family dynamics that might envelop a parent and child when the child is being interrogated by police," there may be a scenario "in which forcing the two to be alone might not be in the best interest of either." Ibid. Instead, the better consideration would be "if a parent and child desire such an opportunity and it is denied, that fact would weigh in the balance against a finding of voluntariness." Ibid.

Pursuant to these principles, we discern no reversible error on account of the fact defendant and his brother did not consult in private. The trial judge accorded the necessary weight to the fact the brothers did not speak in private. However, the totality of the circumstances showed this was not a decisive factor. Indeed, after investigators read defendant his <u>Miranda</u> rights, he neither exhibited confusion nor hesitancy in proceeding, or a desire to speak with his brother outside the presence of investigators. Instead, he clearly indicated he was willing to waive his <u>Miranda</u> rights and speak with investigators.

There is no evidence investigators administered defendant's <u>Miranda</u> rights incorrectly or that defendant did not understand his rights. Investigators read and explained each of defendant's <u>Miranda</u> rights. If defendant indicated any confusion, they promptly stopped reading and sought clarification. The following colloquy demonstrates our point:

> LIEUTENANT TOZZI: So[,] the first one is you have the right to remain silent, and to refuse to answer any questions. Do you understand what that means?
>
> [DEFENDANT]: I've – no, but I've heard of it.
>
> LIEUTENANT TOZZI: Okay. Well –
>
> [DEFENDANT]: Kind of, so –

LIEUTENANT TOZZI:  Well, you have the right – see this right here?  You have the right to remain silent[] and refuse to answer any questions.

DETECTIVE VERDADEIRO:  You read, right?  You read?  (Indiscernible).

[DEFENDANT]:  Oh, yeah, I read.

DETECTIVE VERDADEIRO:  Do you want to read it to yourself to see if you understand it better?  Read it to yourself.  Read it out loud.

[DEFENDANT]:  You have the right to remain silent[] and refuse to answer any questions.

DETECTIVE VERDADEIRO:  Okay, do you understand that?  What does that mean to you?

[DEFENDANT]:  I don't know how to word it really.

. . . .

DETECTIVE VERDADEIRO:  All right, do you want me to help you with this?

[DEFENDANT]:  Um –

DETECTIVE VERDADEIRO:  Can I help you?

[DEFENDANT]:  Yeah, sure.

DETECTIVE VERDADEIRO:  It means that you don't have to say anything at all.

[DEFENDANT]:  Yeah.

DETECTIVE VERDADEIRO:  That's what it means.

[DEFENDANT]: Yeah.

LIEUTENANT TOZZI: (Indiscernible).

DETECTIVE VERDADEIRO: And if we ask you questions, you don't have to answer.

[DEFENDANT]: Um.

DETECTIVE VERDADEIRO: Do you understand that?

[DEFENDANT]: Yes.

DETECTIVE VERDADEIRO: Is that simple enough?

[DEFENDANT]: Yeah, that's simple.

DETECTIVE VERDADEIRO: Okay.

LIEUTENANT TOZZI: Do you understand that?

[DEFENDANT]: I do.

Investigators explained defendant's right to an attorney in the following colloquy:

LIEUTENANT TOZZI: . . . You have the right to consult with an attorney at any time and have him present before and during questioning. Do you understand what that means?

[DEFENDANT]: Uh, no.

LIEUTENANT TOZZI: Okay. So[,] what that means is that you have the right to consult with an attorney.

40

[DEFENDANT]:  Um-hum.

LIEUTENANT TOZZI:  Okay?

[DEFENDANT]:  Yeah.

LIEUTENANT TOZZI:  At any time, okay?  So you can have it before questioning, you can have it during questioning –

[DEFENDANT]:  Yeah.

LIEUTENANT TOZZI:  – you can have it after questioning.

[DEFENDANT]:  (Indiscernible).

LIEUTENANT TOZZI:  Okay.  Do you know what an attorney is?

[DEFENDANT]:  Kind of similar to like a lawyer?

DETECTIVE VERDADEIRO:  There you go.

LIEUTENANT TOZZI:  Right, that's the lawyer.

DETECTIVE VERDADEIRO:  You got it.

LIEUTENANT TOZZI:  Same thing as a lawyer.

[DEFENDANT]:  (Indiscernible).

LIEUTENANT TOZZI:  [S]o do you understand what this means then?

[DEFENDANT]:  Yeah, I could have him, like before and after (indiscernible).

LIEUTENANT TOZZI:  Correct.  Correct.

DETECTIVE VERDADEIRO:  That's right.

LIEUTENANT TOZZI:  All right, so I just need you to put your signature right there again.

[DEFENDANT]:  All right.

LIEUTENANT TOZZI:  Your initials, I mean.

DETECTIVE VERDADEIRO:  You understand it, correct?

[DEFENDANT]:  I do understand it.

These colloquies not only demonstrate that investigators did not misinform defendant about his rights, but they also show a conversation beyond defendant offering one-word responses in acknowledging his rights.  Defendant had no issue informing investigators when he did not understand something they were reading to him.

We are also unconvinced defendant's status as a special needs student was dispositive of the validity of the Miranda waiver.  The evidence presented by the State showed defendant was articulate and intelligent.  In school, he received good grades and had various responsibilities.  He spoke about his plans to go to college and study psychology.  Defendant was literate and conversed with investigators about the books he enjoyed reading and his other hobbies.

42

Throughout the interrogation, defendant was engaged and responded appropriately to the questions posed to him. Although he discussed the imaginary things he had seen or heard in the past, he did so in a well-spoken manner and described the visions in detail, providing dates and other specifics.

An individual's invocation of the right to remain silent must be "scrupulously honored." State v. Johnson, 120 N.J. 263, 282 (1990) (quoting Miranda, 384 U.S. at 467). The invocation "does not have to follow a prescribed script," nor must the individual "utter talismanic words"; individuals "unschooled in the law . . . will often speak in plain language using simple words, not in the parlance of a constitutional scholar." S.S., 229 N.J. at 383. When an individual makes a statement that "equivocal[ly] indicat[es]" a desire to remain silent, and police are "reasonably unsure whether the suspect [is] asserting that right," they should seek to clarify the individual's intentions. Johnson, 120 N.J. at 283.

Defendant claims he invoked his right to remain silent when he remarked "I don't want to tell you that much" and "I wouldn't say anything for the most part" during the interrogation. We are unpersuaded. At best, defendant expressed a hesitation about answering questions. The following colloquy demonstrates the point:

LIEUTENANT TOZZI: Can you tell me what happened?

[DEFENDANT]: I don't want to tell you that much.

LIEUTENANT TOZZI: What's that?

[DEFENDANT]: Not when (indiscernible) for the most part.

LIEUTENANT TOZZI: (Indiscernible).

DETECTIVE VERDADEIRO: (Indiscernible).

[DEFENDANT]: I said I wouldn't say anything for the most part, uh –

LIEUTENANT TOZZI: Okay. Well, tell me what happened.

[DEFENDANT]: I don't really know. Like, um, I mean, I didn't really talk about this, but, like, certain times in my life, like, that I kind of, like, see or, like, hear stuff that wasn't there.

Thereafter, defendant engaged investigators in a conversation regarding his past, and eventually returned to the events surrounding the murders.

Defendant points to the following remarks, which he claims were dispositive: "Well, I mean, I don't like to talk about it," and " just say, like, the rest is history pretty much." However, in context, these statements do not convey a desire to terminate the interrogation as demonstrated by the following colloquy:

LIEUTENANT TOZZI:  Okay.  So[,] did your mom come up to look for you?

[DEFENDANT]:  Yeah.

LIEUTENANT TOZZI:  And what happened?

[DEFENDANT]:  Well, I mean, I don't like to talk about it.  But – but just say, like, the rest is history pretty much.

. . . .

DETECTIVE VERDADEIRO:  Tell us what happened, buddy.

[DEFENDANT]:  It was, like, it wasn't even her or anyone else.

LIEUTENANT TOZZI:  Right, right.

[DEFENDANT]:  Like – it was like I was watching a movie, so to speak.

LIEUTENANT TOZZI:  Right.

[DEFENDANT]:  It felt like I was, like, sitting back and, like, somebody else like –

LIEUTENANT TOZZI:  Right.

[DEFENDANT]:  – (indiscernible) and that's why –

LIEUTENANT TOZZI:  Did you shoot your mother?

[DEFENDANT]:  Yeah.

A-3753-21

Defendant voluntarily answered the investigator's questions. The record further shows investigators addressed defendant in a calm and cordial manner. He was not pressured to speak or answer questions. He was permitted to have water and take bathroom breaks. The entire interrogation lasted approximately one hour and thirteen minutes. We discern no basis to second-guess the trial judge's ruling on the suppression motion.

## II.

In point II, defendant argues the jury selection process violated the rights and protections afforded to him by our Supreme Court, Administrative Directives, and the Sixth Amendment. He asserts "daily wage earners" were categorically dismissed from the jury pool and "mandatory protocols" that were put in place in response to the COVID-19 pandemic "were not [] followed."

Due to the pandemic, jury selection was conducted virtually. The initial jury pool was separated into three large groups, which were each addressed individually. Potential jurors were shown a calendar, which indicated the dates they were needed for service. After displaying the calendar, the trial judge asked prospective jurors to "raise [their] hand" if they were available on those dates. The jurors who indicated they were available were then separated from the jurors who did not. The latter group was excused. The group who raised their hands

46

were then provided with information about the case by the judge. After receiving a summary of the case, the jurors were asked to raise their hands if they believed they could be fair and impartial. Those who did not raise their hands were excused. The judge repeated the process with the second and third groups of prospective jurors. Neither the State nor the defense objected to this process.

Next, the trial judge gave the remaining prospective jurors preliminary instructions, which included an explanation of the court's pandemic precautions and the voir dire process. He explained each question in the jury questionnaire. The judge separated the prospective jurors into smaller groups of thirty. Due to time restrictions, he addressed one group and released the others, asking them to return the following week. Then the judge spoke with every prospective juror individually, going over their answers to the jury questionnaire and pertinent background information. The individual interviews continued the following week. The judge asked counsel the following: "Is there anything about the way that the process was [done] today that is objectionable either to the State and/or to the defense?" Each side responded, no.

A trial court has broad discretionary powers in conducting voir dire, which "will ordinarily not be disturbed on appeal." State v. Williams, 113 N.J. 393,

410 (1988) (quoting State v. Jackson, 43 N.J. 148, 160 (1964)). "Jury-selection processes are presumed valid and a defendant challenging a jury-selection process 'must show by a preponderance of the believable evidence that the attacked process is fatally flawed.'" State v. Dangcil, 248 N.J. 114, 141 (2021) (quoting State v. Long, 204 N.J. Super. 469, 485 (Law Div. 1985)). A defendant must (1) "identify a constitutionally-cognizable group," (2) "prove substantial underrepresentation over a significant period of time," and (3) "show discriminatory purpose either by the strength of [their] statistical showing or by showing the use of racially non-neutral selection procedures to support the inference of discrimination raised by substantial underrepresentation." Ibid. (quoting State v. Dixon, 125 N.J. 223, 232 (1991)).

A constitutionally cognizable group "at minimum . . . include[s] those defined on the basis of religious principles, race, color, ancestry, national origin, and sex." Id. at 142-43 (quoting State v. Gilmore, 103 N.J. 508, 526 n.3 (1986)). "Daily wage earners, or others who cannot serve on a jury for long because of salary or wage deprivation, may not be excluded categorically." State v. Williams, 171 N.J. 151, 170 (2002).

There is no evidence daily wage earners were excluded as a group. The jury selection procedure we described above did not inquire into the nature of

48

prospective jurors' earnings or the reasons why they were unavailable to serve on the dates proffered by the trial judge to lead us to conclude there was a categorical exclusion of daily wage earners.

Regardless, "[t]he financial realities of jury service require that courts have the discretion to excuse a juror on the basis of financial hardship." Williams, 171 N.J. at 165. "When the issue of financial hardship is brought into focus at an early stage of a criminal proceeding, the balancing of interests allows greater flexibility favoring the prospective juror . . . ." Id. at 164. Therefore, while "no socio-economic group" may be excluded "from potential service[,]" dismissal based on "financial hardship" is acceptable and that dismissal is "best resolved before the jury is sworn." Id. at 170.

Likewise, the jury selection process did not violate Judiciary policy. The Judiciary issued a Notice to the Bar, which provided for a "comprehensive update on the resumption of in-person jury trials" pursuant to a May 11, 2021 Supreme Court order[5] regarding the COVID-19 pandemic. Sup. Ct. of N.J., Notice to the Bar: COVID-19–Criminal and Civil Jury Trials (May 17, 2021). It stated, in pertinent part:

---

[5] Although defendant's brief cites several orders, this was the only order in effect at the time of his trial.

A-3753-21

Other aspects of the voir dire process will remain consistent with in-person practices, <u>with judges exercising substantial discretion as to how to question jurors</u>. Among other matters, hardship requests will be handled as provided in Section 4.7.2 of the Bench Manual ("The questions regarding disqualification of a juror may be reviewed at the outset along with hardship issues. Jurors determined by the court to have reasons why they cannot serve can be excused immediately.") In the virtual setting, this means that where a judge grants a hardship excuse (whether in the presence of the panel or during individual questioning in a sidebar breakout room), the juror may be able to log out of the virtual session. Consistent with Section 4.8 "judges in their discretion may alter the sequence and working of the questions as they determine appropriate, as long as the substance is not materially modified."

[<u>Id.</u> at 6 (emphasis added).]

The trial judge's excusal of prospective jurors who either were unavailable on the required dates or indicated they could not be fair and impartial fell well within the "substantial discretion" accorded by the Supreme Court and did not violate Judiciary policy. The jury selection process here proceeded efficiently, without any objection from the parties, and did not categorically exclude groups of prospective jurors.

III.

In point III, defendant argues that "the cumulative effect of the

50

prosecutorial misconduct" requires a new trial. We address each instance in turn.

A.

Defendant asserts the trial judge should have granted a mistrial when, during the prosecutor's opening statement, she[6] said: "This is not simply an insanity case. This is a murder trial. This is about four victims, four people who were killed in an unprovoked attack in their own home when they should have been safe. This is murder." In response to the defense's motion, the trial judge pointed out the State could say the case was about murder "because that's what the jurors are here to decide." This was "the nature of the case." When defense counsel later renewed his request for a mistrial, he alleged the prosecutor's remarks were improper because they inappropriately reflected her "personal opinion." The judge found no evidence of the prosecutor injecting her personal beliefs into the case.

"A prosecutor's opening statement 'should provide an outline or roadmap of the State's case' and 'should be limited to a general recital of what the State expects, in good faith, to prove by competent evidence.'" State v. Land, 435 N.J. Super. 249, 269 (App. Div. 2014) (quoting State v. Walden, 370 N.J. Super.

_____

[6] The State's trial team was comprised of two prosecutors.

549, 558 (App. Div. 2004)).  It is generally "well-established that prosecuting attorneys, within reasonable limitations, are afforded considerable leeway in making opening statements and summations."  Williams, 113 N.J. at 447 (citing State v. Perry, 65 N.J. 45, 47 (1974)).  With respect to a prosecutor's remarks in opening statements, and closing statements as well, "any deviation from perfection 'must be clear and unmistakable and must substantially prejudice the defendant's fundamental right to have the jury fairly evaluate the merits of his defense.'"  State v. Cherry, 289 N.J. Super. 503, 527 (App. Div. 1995) (quoting State v. Bucanis, 26 N.J. 45, 56 (1958)).

We affirm substantially for the reasons expressed by the trial judge.  There was nothing improper about the prosecutor characterizing defendant's actions as murder.  The jury was fully aware what the case was about because during jury selection the trial judge advised them, they would be considering "four counts of murder, and one count of possession of a weapon for an unlawful purpose."  The prosecutor's comments were fair and factual, and did not reflect her opinion.

## B.

Defendant argues the prosecutor improperly insinuated his aunt was lying.  During the aunt's direct examination, the prosecutor asked her about conversations, which had taken place during car trips with defendant and his

mother. The prosecutor asked what defendant said during those trips, and she responded, "he want[ed] to talk to the shrink . . . at school . . . about his bad thoughts." When the prosecutor asked: "What kind of bad thoughts?" the following colloquy ensued:

> A: Hurting the family. No, not the family. The neighbor kid.
>
> . . . .
>
> A: He just had bad thoughts.
>
> Q: I know this is tough because you love [defendant], don't you?
>
> A: Oh, yeah.
>
> Q: Okay. Do you love what he did?
>
> A: No.
>
> Q: But you still love him.
>
> A: Yes. That's the only reason I talked to anybody because I thought I was protecting him.
>
> Q: When he was talking to you in the car on these Fridays about hurting the family, was it just general, or was he specific?
>
> A: Um-hum, just – I'm not sure.
>
> Q: Okay.

A-3753-21

A: Definitely he was having bad thoughts, he wanted to talk to the doctor.

Q: Okay.

A: But that was between him and her. He didn't say it to –

Q: Right. Again, he wasn't talking to you, but you were in the car, yeah?

A: Yup.

Q: And you heard it.

A: I heard him.

Q: Okay. What are the two rules about testifying?

A: I know; told you.

Q: Okay. Well, the first one's what?

A: But the car was just –

At this point, defense counsel objected. The trial judge sustained the objection and instructed the prosecutor to reframe the question and the jury to disregard the exchange between the prosecutor and the aunt.

We review the trial court's ruling under the plain error standard. State v. G.E.P., 243 N.J. 362, 389 (2020). An alleged error brought to the trial judge's attention will not be grounds for reversal if it was "harmless error." State v. J.R., 227 N.J. 393, 417 (2017).

54

A prosecutor "may point out discrepancies in a witness's testimony or a witness's interests in presenting a particular version of events." State v. Johnson, 287 N.J. Super. 247, 267 (App. Div. 1996) (citing State v. Purnell, 126 N.J. 518, 538 (1992)). However, they may not "express [their] personal opinion on the veracity of any witness." State v. Rivera, 437 N.J. Super. 434, 463 (App. Div. 2014) (citing State v. Marshall, 123 N.J. 1, 154 (1991)). Pursuant to that standard, we consider "whether in all the circumstances there [is] a reasonable doubt as to whether the [alleged] error denied a fair trial and a fair decision on the merits." Ibid. (first alteration in original) (quoting State v. Mohammed, 226 N.J. 71, 86-87 (2016)).

The colloquy above showed the prosecutor was growing frustrated with the aunt's responses to the questioning. But the prosecutor never commented on the witness's veracity. The judge sustained the defense's objection and instructed the jurors to disregard the exchange between the prosecutor and the aunt. Jurors are presumed to understand and follow directions. State v. Vega-Larregui, 246 N.J. 94, 126 (2021).

We discern no reversible error. The prosecutor's questions did not have the capacity to deny defendant a fair trial.

## C.

Defendant asserts it was prosecutorial misconduct to question Dr. Santina about a defense report created by another professional for defendant's waiver hearing from juvenile to adult court. Dr. Santina had testified on direct that she reviewed Dr. Dietz's report, which referenced the report prepared for the waiver hearing. During the State's re-cross examination of Dr. Santina, the prosecutor said defense counsel "was just asking you questions about other people's reports and whether or not they looked at this case as closely as you did. Do you remember those questions?" The prosecutor then asked if defense counsel had given the doctor the report from the waiver hearing. Defense counsel objected to the question and the trial judge overruled it. Dr. Santina testified she had not been given the report, but she understood "it was created for the purposes of the waiver hearing [defendant] was originally facing a waiver to adult [c]ourt."

Although defense counsel did not object to Dr. Santina's mention of the waiver hearing, the trial judge paused to instruct the jury. He explained what a waiver hearing was and instructed the jury that "other than that[,] . . . [y]ou are not to take into consideration at all, for any purpose, for any reason the fact of any type of previous proceeding or previous hearing." The judge reminded the

jury its "sole purpose [was] to decide what the facts are in this case" based on the evidence presented and the law as explained by him at the end of the case.

When the defense moved for a new trial, it argued prosecutorial misconduct for the same reason asserted at trial. The judge concluded it was appropriate for the prosecutor to ask whether Dr. Santina had the defense report from the waiver hearing because the prosecutor did not know the doctor did not have the report. The prosecutor did not act inappropriately because he asked questions designed to elicit "yes" or "no" answers, and the doctor responded with embellished answers. Indeed, "[t]he State did not reference the waiver hearing in its question of Dr. Santina[, or] . . . provoke her to answer the question to reference the waiver hearing. The State merely inquired whether Dr. Santina was aware of the report and the manner – was aware of the report."

"The scope of the cross-examination of an expert is within the trial court's discretion," and a reviewing court must "not interfere unless clear error and prejudice are shown." State v. Scherzer, 301 N.J. Super. 363, 415 (App. Div. 1997) (citing State v. Martini, 131 N.J. 176, 263 (1993), overruled on other grounds by State v. Fortin, 178 N.J. 540 (2004)). "Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial. The failure to object suggests that defense counsel did not believe the remarks

were prejudicial at the time they were made." State v. Frost, 158 N.J. 76, 83-84 (1999) (citation omitted).

Pursuant to these principles and having reviewed the record, we affirm for the reasons expressed by the trial judge. The prosecutor's questions were fair game, and those questions did not prompt Dr. Santina to testify about the waiver hearing. The trial judge also gave the jury a curative instruction, which we have no reason to doubt it followed. We discern no reversible error.

D.

Prosecutors "are expected to make vigorous and forceful closing arguments to juries." Id. at 82 (citing State v. Harris, 141 N.J. 525, 559 (1995)). They "are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." Ibid. "Even so, in the prosecutor's effort to see that justice is done, the prosecutor 'should not make inaccurate legal or factual assertions during a trial.'" State v. Bradshaw, 195 N.J. 493, 510 (2008) (quoting Frost, 158 N.J. at 85).

A prosecutor may not "express [their] personal opinion on the veracity of any witness." Rivera, 437 N.J. Super. at 463 (citing Marshall, 123 N.J. at 586). A repeated accusation that a defendant is a liar can constitute reversible error. State v. Supreme Life, 473 N.J. Super. 165, 176 (App. Div. 2022); see also State

v. Pennington, 119 N.J. 547, 576-77 (1990) (holding that it is improper for a prosecutor to use derogatory epithets to describe a defendant). "'A prosecutor is not permitted to cast unjustified aspersions' on defense counsel or the defense." State v. Acker, 265 N.J. Super. 351, 356 (App. Div. 1993) (quoting State v. Lockett, 249 N.J. Super. 428, 434 (App. Div. 1991)). However, a "prosecutor may attempt to persuade the jury that a witness is not credible and in doing so, 'may point out discrepancies in a witness's testimony or a witness's interests in presenting a particular version of events.'" Supreme Life, 473 N.J. Super. at 174 (quoting Johnson, 287 N.J. Super. at 267).

"[A] prosecutor should 'confine [their] comments to evidence revealed during the trial and reasonable inferences to be drawn from that evidence.'" Bradshaw, 195 N.J. at 510 (quoting State v. Smith, 167 N.J. 158, 178 (2001)). "So long as the prosecutor's comments are based on the evidence in the case and the reasonable inferences from that evidence, the prosecutor's comments 'will afford no ground for reversal.'" Ibid. (quoting State v. Johnson, 31 N.J. 489, 510 (1960)). However, improper comments are grounds "for reversal where the prosecutor's misconduct was so egregious that it deprived the defendant of a fair trial." Frost, 158 N.J. at 83 (citing State v. Ramseur, 106 N.J. 123, 322 (1987)).

When reviewing a prosecutor's summation, questionable comments are examined "in the context of the entire trial." State v. Morton, 155 N.J. 383, 419 (1998). To justify a reversal, the prosecutor's summation must have been "clearly and unmistakably improper," and must have "substantially prejudiced [the] defendant's fundamental right to have a jury fairly evaluate the merits of [their] defense." State v. Wakefield, 190 N.J. 397, 438 (2007) (quoting State v. Papasavvas, 163 N.J. 565, 616 (2000)). To determine whether a prosecutor's conduct rises to this level, courts look to: "(1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." Smith, 167 N.J. at 182 (citing State v. Timmendequas, 161 N.J. 515, 575 (1999); Marshall, 123 N.J. at 153; Ramseur, 106 N.J. at 322-23).

i.

Defendant argues the prosecutor "excessively disparage[d]" Dr. Santina during summation when he told the jury that "[s]he lied to you from the beginning." The prosecutor also insinuated Dr. Santina withheld information from the jury because she did not videotape her interview with defendant and never explained why. The jury was told Dr. Santina "had the ability to provide

that information to not just the State, and to the defense attorneys, but to you," yet "chose not to." Instead, Dr. Santina "just wants us to trust her." Defendant claims the prosecutor misrepresented the facts when he told the jury Dr. Santina was his treating doctor and had fabricated her initial report.

The prosecutor cross-examined Dr. Santina during voir dire and questioned her regarding an organization she had listed on her curricula vitae (CV). Dr. Santina admitted the organization ceased to exist in 2017 because it promoted "junk science[,]" but she never deleted it from her CV. The prosecutor then used this as fodder to later tell the jury she "lied to you from the beginning." Having considered the context of this statement, we are satisfied it was a fair commentary on the facts presented, and did not deprive defendant of a fair trial.

Likewise, the prosecutor's comments regarding Dr. Santina not recording her evaluation of defendant were not prejudicial. The trial judge explained:

> The State never argued Dr. Santina was required to video record her conversation and/or evaluation of defendant. The State argued that based upon the testimony it would have been more informative to know the defendant's demeanor and the actual words he said during the evaluation.
>
> The State compared the two experts to show how you can look at the defendant's original statement to the police and what he said during Dr. . . . Dietz's interview.

The State on cross[-]examination questioned Dr. Santina on her interview notes. It is this [c]ourt's recollection that Dr. Santina, with her one report, couldn't find her notes. She said maybe they were in her attic.

On the second report she indicated that she did have notes, that they were supplied, and at some point in time[] when she testified she went outside of her notes and said it was her recollection as to what the defendant said, even if it was not in her notes.

Because this is the way that the testimony came out . . . during the course of the trial in front of the [j]ury, the State under those circumstances had in the case, and the ability to make a fair argument that under the circumstances, if Santina video recorded the defendant's statement, that any and all issues could have been seen for the [j]urors and they could have decided for themselves what he said to her.

The State's arguments in summation was only addressing Dr. Santina's ability to accurately recall, recollect and accurately relate her interview with the defendant. This was wholly proper under the circumstances. The remarks by the prosecutor were legitimate based upon the evidence in the case . . . .

The judge's reasoning is supported by the record and was unassailable.

We affirm for the same reasons. The prosecutor did not commit reversible error

when he characterized Dr. Santina's relationship with defendant as a clinical

relationship. Dr. Santina testified she conducted a clinical interview in 2019 at

the behest of defendant's guardian ad litem. The prosecutor's point was to show

Dr. Santina played both a clinical and a forensic role, whereas Dr. Dietz only had a forensic role. He asserted that in the clinical role "the doctor is supposed to not question things. [J]ust accept them as they come. And not push back and not question or probe." That "maybe the reason Dr. Santina didn't push back at all in 2020, is because of that relationship, she couldn't shift out of one mode to another, that dual agency." Moreover, because the defense retained Dr. Santina for the trial because she "had already given them[] that the defendant wasn't malingering, and the defendant was schizophrenic. She had already decided what her opinion was. With wildly incomplete information. She had already given them the answer."

Both experts testified regarding the differences between a clinical and forensic interview; the former being to treat the patient, and the latter to gather forensic evidence for trial. Therefore, it was fair for the prosecutor to comment on these differences and the fact that Dr. Santina's dual roles undermined her opinion. The prosecutor's summation was based on credible evidence in the record, and did not deprive defendant of a fair trial.

63

ii.

Defendant argues the prosecutor accused him of lying during summations and commented about his brother and aunt's veracity. He asserts decisions about credibility and truthfulness were for the jury to make.

The prosecutor commented as follows:

> [D]efendant understandably is looking for something to hang his hat on that makes it not his fault. And the cynical part of me would say that that's because he's trying to become Scott Free. That he's trying to get over on the charges. And that may be . . . but Dr. Dietz even said that that's not necessarily so. That it could be that he just honestly wants to believe that despite the fact this was entirely within his control, that he might want to believe it was something else. So he looks for something else to blame.
>
> It's his tumor, it's the pills, it's schizophrenia, it's whatever. Again, . . . my instinct as a [p]rosecutor might be to call it lying, but Dr. Dietz gave you a more broad way to look at it. That maybe it's not. That maybe he's just searching for that meaning, which is perfectly understandable for . . . defendant to do.
>
> And we've seen examples of . . . defendant's family, even joining in that and encouraging that. That's perfectly natural and normal for them to do that too. Not faulting them for that.
>
> But when Dr. Santina does it, when Dr. Santina, a hired professional does it, that's where you've got to draw the line, I suggest.

Read in context, it is clear the prosecutor was not impugning defendant. Rather, he was explaining to the jury that the defense was attempting to rationalize defendant's actions by placing the blame on conditions that were outside defendant's control. This was a reasonable argument based on the evidence in the record, which showed defendant told the investigators, Dr. Santina and Dr. Dietz, different stories.

Regarding defendant's brother and aunt, defendant points us to this passage from the summation:

> But then you had family members who saw less, like [defendant's aunt]. She had a different perspective than a lot of people because she was there on those Friday call-outs (phonetic), she was there in the house listening to him, listening to the threats that he made. But even her perceptions of that event were different, because she heard the shots, she saw the bullets coming through, got everybody to scatter and tried to get people to run.
>
> When she testified you could see, I think, how conflicted she was about her affection towards her nephew and her obligation to tell the truth. To report accurately what she had heard him say and what she had told the police. She had kept her sister's secret, that first interview, right? And then felt the need to tell people after the fact.
>
> . . . .
>
> A lot of the clips you heard played, and again you'll have to decide if they're cut from the proper areas

65

or how accurate or complete they were, was from [defendant's eldest brother]. And I do not mean any disrespect to him or anyone else. But I think we have to be honest about how he testified. I think it's pretty clear that he testified with an agenda.

How many times did he interrupt a question or try to blurt something out, despite even the [j]udge telling him not to. Is that somebody who just came here to tell you factually what happened, or was that somebody who was pushing a narrative? And again, I understand why. It's his brother. But that doesn't mean he didn't do it.

. . . .

Do you think [defendant's eldest brother] was over-selling? Right? That the [school defendant attended] isn't a school for kids with special needs, . . . he tried to describe it as some kind of academy where he could tell at a distance that they were all whatever. Did that sound factual to you? Did that sound honest to you? Or do you think he testified with an agenda?

And again, I'm not even going to say it was wrong to do it. It's his brother. But that doesn't mean he didn't do it. He didn't witness anything that night, he didn't see anything that night.

Again, these comments were fair arguments based on the evidence presented at trial. The defense did not object to them. The aunt's testimony described her relationship with defendant and her desire to protect him. The eldest brother described his relationship with defendant as "extremely close."

Therefore, it was proper for the prosecutor to assert these witnesses could be biased towards defendant.

## IV.

In point IV, defendant contends that because of the trial judge's comments and interruptions during Dr. Santina's testimony, he did not receive a fair trial. He claims Dr. Dietz was permitted to give long narrative answers, whereas Dr. Santina was not. Defendant asserts the judge treated the experts disparately. The judge also permitted the experts to give the jury the wrong legal standard for insanity.

"In our judicial system, the trial court controls the flow of proceedings in the courtroom." State v. Jones, 232 N.J. 308, 311 (2018). N.J.R.E. 611(a) authorizes the trial judge to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment."

"Trial courts can and should intervene at trial in certain circumstances." State v. Taffaro, 195 N.J. 442, 450 (2008). "The discretionary power of a judge to participate in the development of proof is of 'high value,' because a fair trial

is [their] responsibility." State v. Medina, 349 N.J. Super. 108, 130-31 (App. Div. 2002) (quoting State v. Guido, 40 N.J. 191, 207 (1963)).

While "[t]he intervention of a trial judge is a 'desirable procedure,' . . . it must be exercised with restraint." Ibid. (quoting Vill. of Ridgewood v. Sreel Inv. Corp., 28 N.J. 121, 132 (1958)). "There is a point at which the judge may cross that fine line that separates advocacy from impartiality." Ibid. (quoting Sreel Inv. Corp., 28 N.J. at 132). If the line is crossed, "[a] trial judge 'may so take over the entire proceedings as to create prejudicial error . . . .'" Ibid. (omission in original) (quoting Davanne Realty Co. v. Brune, 67 N.J. Super. 500, 511 (App. Div. 1961)).

"In determining whether a trial judge crossed over this line, we must examine the record as a whole." State v. Ross, 229 N.J. 389, 409 (2017). "The critical concern, of course, is that a court not suggest to jurors . . . that it is taking one party's side." Taffaro, 195 N.J. at 451. "[O]fficial expressions of displeasure or disapproval may convey to the jury the belief that defense counsel was somehow acting improperly, disrespectfully, or deceptively; or worse yet, give the impression that the judge has an opinion of [the] defendant's guilt or innocence." State v. Tilghman, 385 N.J. Super. 45, 49 (App. Div. 2006).

"[I]solated instances of judicial annoyance or impatience do not warrant the drastic remedy of vitiating an otherwise valid conviction." Medina, 349 N.J. Super. at 132. Therefore, "in reviewing a claim of prejudicial intervention by a trial judge," we "must determine whether, in the aggregate, 'the actions of the trial judge deprived the defendant of a fair trial.'" Hitchman v. Nagy, 382 N.J. Super. 433, 452 (App. Div. 2006) (quoting Mercer v. Weyerhaeuser Co., 324 N.J. Super. 290, 299 (App. Div. 1999)).

We "apply the abuse of discretion standard when examining the trial court's exercise of that control." Jones, 232 N.J. at 311. "[A] functional approach to abuse of discretion examines whether there are good reasons for an appellate court to defer to the particular decision at issue." State v. R.Y., 242 N.J. 48, 65 (2020) (alteration in original) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

Dr. Santina testified over the course of three days. The transcript from the first day of trial shows she was questioned on direct at length before the judge interjected. When the judge intervened for the first time, it was to prevent Dr. Santina from giving a narrative answer. Much later, the judge interjected a second time to focus Dr. Santina on defense counsel's question about the origins of the diagnoses listed in defendant's IEP. The record shows Dr. Santina did not

answer the question and appeared to answer a different question, which required the judge to clarify what defense counsel was asking after which the doctor answered the question succinctly.

The third time the trial judge interjected was the following trial day during the State's cross-examination. When the prosecutor asked Dr. Santina whether she edited out certain information from her 2019 report, she began to answer what she edited out. The judge intervened and pointed out the prosecutor did not ask what she edited out and requested that she answer the question the prosecutor posed. Much later in the transcript, the trial judge intervened for a fourth time and then much later again for a fifth time for the same reason.

The trial judge's next interjection occurred on the third day of Dr. Santina's testimony during the ongoing cross-examination. The prosecutor asked the doctor a "yes" or "no" question, to which she responded in narrative form, requiring the judge to re-direct her. The final interjection came at the outset of Dr. Santina's re-direct testimony. Defense counsel asked the doctor "yes" or "no" questions and she again offered an answer beyond the scope of the question and the redirect, resulting in the judge's intervention.

Pursuant to our review of the record, there is no basis to conclude the trial judge overstepped boundaries and interfered with the trial in a prejudicial way.

A-3753-21

The defense never objected to his interventions. The judge made limited interjections over the course of three days, and his actions were well within his authority under N.J.R.E. 611(a). Additionally, the jury instructions reminded the jury that they were the factfinders and should not be influenced by the questions or remarks made by the judge during the witness testimony. We presume the jury followed the judge's instructions, and the record has provided no reason for us to believe otherwise. Vega-Larregui, 246 N.J. at 126.

The trial judge did not treat the experts in a disparate manner. The record shows Dr. Dietz testified in narrative fashion only twice over the course of three days of testimony. On both occasions, his answers were responsive. And on both occasions defense counsel objected, and the trial judge instructed the State to proceed with a follow-up question thereby ending the narrative.

As evidence of the disparate treatment of the experts by the trial judge, defendant claims Dr. Dietz was permitted to give non-responsive answers, whereas Dr. Santina was not. The prosecutor had asked Dr. Dietz his common practice in reviewing the evidence, and the doctor responded that among the things he does is to go to the crime scene, then proceeded to explain how the practice was developed from other investigations. Our review of the record

71

shows the doctor's answer was responsive and not evidence of favorable treatment of the State's witnesses.

Defendant claims the court prejudiced the outcome by permitting Dr. Dietz to testify regarding the legal definition of insanity and give the jury the incorrect legal standard, without correcting the doctor's statement. He also asserts the prosecutor gave Dr. Santina an incorrect legal definition for insanity and then the judge interrupted the doctor as she responded to the prosecutor in a prejudicial manner.

The record does not support defendant's contentions. Dr. Santina testified defendant "was not capable of understanding the nature of his actions" and did not "appreciate the wrongfulness" of his actions. Her report said defendant "did not know or recognize the nature or quality of his actions," and said nothing about whether he appreciated the wrongfulness of his actions. The prosecutor's questions went to this discrepancy because the doctor's testimony implied defendant met both prongs of the insanity defense while her written report suggested he met only one.

Dr. Dietz's testimony did not draw legal conclusions. Rather, he explained how his approach to evaluating defendant differed from Dr. Santina's. He said her approach was that

defendant's knowledge of the nature and quality of his acts encompassed the issue of his knowledge or wrongfulness. I don't think that's true at all. I think these are two completely separate issues that need to be treated separately[,] and I think the law requires that we treat them separately as the [j]udge will instruct.

But the big difference I think is that we approached this from . . . a different perspective. My perspective is always get as much information as I can. Try to figure out the truth as best as I'm able which is not always perfect. . . .

I saw Dr. Santina's approach as more of the clinical sort of relying on what the defendant tells her the way one would rely on what a patient says to someone who's treating or helping them.

Notably, the defense did not object to this testimony. We are unconvinced this testimony either exceeded the scope of the experts' roles or constituted prejudicial error.

## V.

In point V, defendant argues his conviction should be overturned because the State introduced prejudicial hearsay evidence through the expert testimony. He asserts the trial judge permitted the State to improperly cross-examine Dr. Santina about the report commissioned by defendant's guardian ad litem for the waiver hearing along with four mental health evaluations. Dr. Dietz had

73

discussed in his report, which Dr. Santina did not have and did not testify about. As a result, the prosecutor impeached Dr. Santina through inadmissible hearsay.

Defendant asserts the judge erred in permitting the State to question Dr. Dietz about a report from one of defendant's school social workers, which said he was ready to move from the special needs school back to public school. He claims the State improperly used this hearsay to create a motive for the murders because defendant did not want to change schools.

Defendant also claims it was improper to allow Dr. Dietz to testify regarding a hearsay message from the brother who witnessed the murders. Likewise, defendant argues it was improper for Dr. Dietz to conclude the grandfather did not have schizophrenia by relying upon hearsay documents showing he was not being treated for schizophrenia, without evaluating the grandfather or reviewing his medical records.

Defendant also maintains it was error to permit Dr. Dietz to testify regarding notes in defendant's school and other records. One note said defendant "could choose to calm himself or pump himself up with music," and another suggested his eldest brother influenced him.

Defendant alleges the prosecutor relied upon the hearsay she adduced through Dr. Dietz's testimony as substantive evidence in summation. The

prosecutor referenced defendant's relationship with music, even though that information was not introduced in the State's case-in-chief. The State also relied upon a social worker's notes to discredit the eldest brother's testimony.

The Rules of Evidence permit an expert witness to rely on evidence that would otherwise be inadmissible so long as "the inadmissible evidence . . . [is] of the type reasonably relied upon by experts in the field." Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 7 on N.J.R.E. 703 (2024-2025). "The hearsay statements so considered are not admitted to establish the truth of their contents, but to apprise the jury of the basis of the expert's opinion." Corcoran v. Sears Roebuck & Co., 312 N.J. Super. 117, 135 (App. Div. 1998) (citing Blanks v. Murphy, 268 N.J. Super. 152, 163-64 (App. Div. 1993)). Experts may rely on documentary hearsay statements, "'interviews,' and 'discussions' with persons having relevant knowledge for the formation of an opinion." Ibid. (citations omitted); see also State v. Torres, 183 N.J. 554, 575-76 (2005) ("[A]n expert may offer out-of-court statements of others to support the opinions presented.").

Trial courts should balance the permissible uses of expert testimony with a defendant's right to confront and cross-examine his accusers. Torres, 183 N.J. at 579. "The expert may not serve merely as a conduit for hearsay statements

of gang members who have been interviewed by the expert but not called as witnesses." Ibid.; see also State v. Vandeweaghe, 351 N.J. Super. 467, 481-83 (App. Div. 2002) (alteration in original) (quoting State v. Farthing, 331 N.J. Super. 58, 78 (App. Div. 2000)) (explaining that expert testimony should not be allowed to become "a vehicle for the 'wholesale [introduction] of otherwise inadmissible evidence'"). Where appropriate, the expert's testimony should be limited to a specific area, and the court should weigh the probative value of the proposed testimony against the potential for prejudice. Torres, 183 N.J. at 579-80.

Furthermore,

> if the expert relied upon the hearsay statement in formulating [their] opinion, the judge must advise the jury that it "should not consider the hearsay statement as substantive evidence relating to the question of guilt or innocence of the accused, but only as evidence tending to support the ultimate expert conclusion of the [witness]."
>
> [Vandeweaghe, 351 N.J. Super. at 480 (third alteration in original) (quoting Farthing, 331 N.J. Super. at 78).]

"[I]f it appears that the expert relied upon the truth of the matter asserted in formulating an opinion, rather than the fact that the statement was made, the jury should be instructed that the probative value of the opinion is dependent upon, and no stronger than, those facts." Id. at 480-81.

A-3753-21

Generally, "the admission or exclusion of evidence is within the discretion of the trial court." Torres, 183 N.J. at 567. The standard is the same for the admission of expert testimony. State v. Zola, 112 N.J. 384, 414 (1988). We apply a "deferential standard of review" to evaluate a trial court's evidentiary rulings. State v. Hyman, 451 N.J. Super. 429, 441 (App. Div. 2017).

A.

Dr. Santina testified that she relied on various medical and educational reports in arriving at her diagnosis of defendant. In accordance with Vandeweaghe, the trial judge instructed the jury during and following Dr. Santina's testimony that she could rely upon the information contained in the other reports, but she directed the jury to disregard the fact she testified about someone else's diagnosis. The judge gave a similar limiting instruction during and following Dr. Dietz's testimony and instructed the jury in a similar manner during summations and in his final charge to the jury. The defense did not object to any of these instructions and remarked as follows:

> I believe that it's important to define hearsay as it pertains to the expert[,] as there's voluminous documents in this case. Both experts relied on a lot of out of court statements as well as prior reports. I don't have an issue with the way that this is, this reads. It is in line with the case law and it's in line with [the] model jury charge[,] so I have no objection to the way that it's written right now in the final charge.

We discern no abuse of discretion. Not only did the defense not object, but the record shows Dr. Santina also testified she reviewed Dr. Dietz's report. That report memorialized his review of several other mental health evaluations. Dr. Santina testified her review of Dr. Dietz's report did not alter her opinion of defendant's diagnosis. Therefore, it was proper for the prosecutor to question her regarding the reports Dr. Dietz relied upon. The record readily establishes the prosecutor was not attempting to introduce inadmissible hearsay, but probing the extent to which Dr. Santina had considered the other reports in rendering her opinion. This was fair game in the State's quest to convince the jury its expert was more credible. For the same reasons, it was appropriate for the prosecutor to question Dr. Dietz about the reports he relied upon to arrive at his conclusions, including a report prepared by a social worker from defendant's school.

Dr. Dietz testified the message from the brother who witnessed the murders, taken as true, spoke to an "important issue," that is, "how often [defendant] said to others that he was planning to harm or kill his family, or other people." He explained "finding a phone record that capture[d] exactly what words were used, was important evidence" for purposes of his diagnosis. The trial judge did not abuse his discretion in permitting this testimony,

especially considering that he gave the jury a limiting instruction on how to consider this evidence.

The testimony regarding the grandfather's alleged schizophrenia was properly admitted. During his evaluation by Dr. Dietz, defendant told the doctor his grandfather had schizophrenia. Therefore, it was appropriate for Dr. Dietz to testify he reviewed the grandfather's records and use those records to analyze and diagnose defendant.

Dr. Dietz testified he used defendant's school records in arriving at his conclusions. He found a note regarding defendant's use of music to calm himself or "pump himself up . . . [to be] significant." The doctor noted defendant had chosen a "militaristic and bellicose [song, which] is a choice to pump himself up, rather than calm himself down." He concluded the type of music defendant selected was "all about preparation. Getting himself pumped . . . [and] strong. No longer the victim of bullies."

Dr. Dietz further testified that defendant's claims he had schizophrenia after the murders were likely influenced by his eldest brother. This is because there was a note showing the eldest brother had visited defendant the day before the note was made and spoke with defendant, so it was possible defendant was repeating parts of conversations he had with his brother during his evaluations.

 A-3753-21

Given the totality of the evidence presented, we conclude neither the evidence regarding the music nor the discussion regarding the elder brother's visit were prejudicial hearsay. The trial judge instructed the jury on how it could consider the hearsay evidence, and we assume the jury followed those instructions.

B.

It is improper for a prosecutor in summation to refer to inadmissible evidence relied upon by a prosecution expert as if the evidence had been substantively admissible. Scherzer, 301 N.J. Super. at 442-44. Whether a cautionary limiting instruction to the jury would be effective in such cases is questionable. See, e.g., State v. Mesz, 459 N.J. Super. 309, 319-20 (App. Div. 2019) (finding plain error in the absence of a limiting instruction, particularly where the prosecutor played the defendant's statement to the jury and used it as substantive evidence of guilt).

Contrary to defendant's claims, the State did not rely upon inadmissible hearsay in summation. Among the evidence discussed by the prosecutor included the testimony and evidence gathered from defendant's cell phone. This evidence was used to show defendant's search history prior to the shootings, including music and videos. Although the prosecutor referenced a report from

defendant's school regarding his relationship with music, the reference was fleeting and could not have prejudiced defendant given the totality of the evidence presented and the limiting instructions regarding hearsay.

Moreover, the prosecutor's comments were in direct response to arguments made by the defense in its summation. Indeed, the defense specifically referenced a song defendant had listened to and argued the jury should not be swayed by the evidence because the State could not prove whether defendant had ever listened to the song, "for two seconds[ or twenty] seconds." The defense also argued the song was from a cartoon and had nothing to do with getting pumped up to commit the murders.

The prosecutor's reference to other medical reports in summation was entirely within the context of discussing Dr. Santina's and Dr. Dietz's reports and the bases for their conclusions. Our review of the record shows the prosecutor did not discuss the hearsay reports as substantive evidence of defendant's guilt, but instead to point out Dr. Santina did not consider the reports.

The prosecutor argued defendant's eldest brother had "testified with an agenda" because he continuously interrupted the questioning to "try to blurt something out, despite even the [j]udge telling him not to." During the brother's

81

cross-examination, the State had shown him jail visitor logs indicating he visited defendant frequently, including on the day prior to defendant's meeting with a social worker. In summation, the prosecutor alleged the eldest brother influenced defendant because records showed the brother visited "defendant in jail and started talking to him about his tumor[,] cognitive dis[sonance,] and splitting the brain . . . [b]ecause . . . defendant is using those words . . . . [Afterwards,] defendant told the social worker, I had a visit with my brother yesterday."

The prosecutor should not have referenced the social worker's report in summation because it was not in evidence. However, the defense did not object. Regardless, the comment was fleeting, and the trial judge's final charge to the jury reminded them of the limiting instructions he had given during the trial regarding the expert's consideration of hearsay, and that the argumentation of counsel in summation was not evidence. For these reasons, we discern no abuse of discretion.

## VI.

In point VI, defendant claims his convictions should be "overturned because the court allowed Dr. Dietz to testify in depth regarding the ultimate issue and the veracity of witnesses in the case." For the first time on appeal,

defendant argues Dr. Dietz inappropriately opined on his and his aunt's veracity. He asserts the doctor commented on the statements defendant made to investigators and other medical professionals, and suggested defendant was not telling the truth regarding the voice he heard in the shower. Dr. Dietz also impugned the aunt's credibility because he testified he was "trying to weigh the likelihood of various events [recorded in her statement] being true or not true."

N.J.R.E. 704 provides that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." "Courts have generally agreed that the admission of psychiatric testimony on the issue of mental state is an evidentiary question that should not be unduly restricted." State v. Galloway, 133 N.J. 631, 649 (1993).

However, "an expert's 'ultimate-issue testimony' usurps the 'jury's singular role in the determination of defendant's guilt and irredeemably taints the remaining trial proofs,'" State v. J.T., 455 N.J. Super. 176, 215 (App. Div. 2018) (quoting State v. Cain, 224 N.J. 410, 424 (2016)), if the expert offers an opinion "about [a] defendant's guilt or innocence." State v. McLean, 205 N.J. 438, 453 (2011). In J.T., we held testimony by the State's expert "usurped the jury's role by making a definitive declaration [about a] jury question" where the expert

"explain[ed] to the jury the concept of 'legal insanity' and then . . . opine[d] on whether [the] defendant's conduct satisfied the elements of this affirmative defense."  455 N.J. Super. at 215.

The defense opened the door when it asked Dr. Santina about defendant's state of mind and if defendant was insane at the time of the murders.  Dr. Santina responded defendant was insane and explained why.  As a result, the State asked Dr. Dietz about the same issues, and he responded defendant was sane and explained why.

When defendant moved for a new trial, defense counsel argued the trial judge should not have permitted Dr. Dietz's testimony.  The judge found the defense had opened the door by eliciting the same objectionable testimony through its expert and the only remedy the judge could employ was to permit the State to ask the same question.

"The doctrine of 'curative admissibility' provides that when one party introduces inadmissible evidence, thereafter the opposing party may introduce otherwise inadmissible evidence to rebut or explain the prior evidence."  State v. James, 144 N.J. 538, 555 (1996) (emphasis omitted) (citing United States v. Nardi, 633 F.2d 972, 977 (1st Cir. 1980)).  Importantly, "[t]he doctrine applies only when inadmissible evidence has been allowed, when that evidence was

prejudicial, and when the proffered testimony would counter that prejudice."
Ibid. (citing Nardi, 633 F.2d at 977).

Pursuant to these principles, it is clear the trial judge's decision to admit Dr. Dietz's testimony was sound. The judge evened the playing field after the defense had its expert testify on the ultimate issue. Thus, this argument lacks merit. R. 2:11-3(e)(2).

Since credibility is uniquely within the province of the jury and within its capacity to judge, expert testimony as to the credibility of other witnesses or parties is not permitted. State v. C.W.H., 465 N.J. Super. 574, 593 (App. Div. 2021). This principle was not violated here because Dr. Dietz never commented on defendant's credibility. Rather, Dr. Dietz's testimony focused on the differences between defendant's statement to investigators and the mental health professionals, including both experts.

The differences regarded the voice defendant claimed to hear in the shower on the day of the incident, which defendant for the first time mentioned to Dr. Santina. Dr. Dietz drew certain conclusions based on this information, and testified he asked defendant about the differences during his evaluation. He explained as follows:

> I am not saying that he's lying to me[] or making this up. I do think he's protecting himself from a recognition of the terrible things he's done by adopting an explanation in which somehow mental illness did this to him, now that he's lost the brain tumor explanation for it.
>
> That it's important for him to be able to live with what he's done. And if he can blame mental illness, that's easier on him than taking responsibility for it.

It is clear the testimony was not about assessing defendant's credibility but understanding what his state of mind was at the time of the murders.

Dr. Dietz explained he considered the aunt's statement in evaluating defendant's mental state with care because it was hearsay and witness memory can be fallible. The doctor explained his approach with all such statements is with "[a] skeptical and hopefully discerning eye. I realize that not everything that people are quoted as saying is quoted accurately. Not everything that they're saying is true. Of course. And so[,] I'm trying to weigh the likelihood of various events being true or not true." Dr. Dietz did not comment on the aunt's credibility.

## VII.

In point VII, defendant argues for a new trial because the final "jury charge did not correctly instruct as to the relevant law and was misleading." He

claims the instruction on the possession of a weapon for an unlawful purpose offense was incorrect and confusing.

"Appropriate and proper charges to a jury are essential for a fair trial." State v. Carrero, 229 N.J. 118, 127 (2017) (quoting State v. Daniels, 224 N.J. 168, 180 (2016)). In charging a jury, a "trial court must give 'a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'" State v. Baum, 224 N.J. 147, 159 (2016) (quoting State v. Green, 86 N.J. 281, 287-88 (1981)). "[B]ecause correct jury charges are especially critical in guiding deliberations in criminal matters, improper instructions on material issues are presumed to constitute reversible error." State v. Jenkins, 178 N.J. 347, 361 (2004). "The test to be applied . . . is whether the charge as a whole is misleading, or sets forth accurately and fairly the controlling principles of law." Baum, 224 N.J. at 159 (omission in original) (quoting State v. Jackmon, 305 N.J. Super. 274, 299 (App. Div. 1997)).

"[A] jury charge is presumed to be proper when it tracks the model jury charge because the process to adopt model jury charges is 'comprehensive and thorough.'" State v. Cotto, 471 N.J. Super. 489, 543 (App. Div. 2022) (quoting State v. R.B., 183 N.J. 308, 325 (2005)). "Ordinarily, the better practice is to

mold the instruction in a manner that explains the law to the jury in the context of the material facts of the case." State v. Concepcion, 111 N.J. 373, 379 (1988). "However, there is no principle requiring that in every case a court must deliver a specifically tailored instruction relating the facts of the case to the applicable law." State v. T.C., 347 N.J. Super. 219, 240 (App. Div. 2002). "Accordingly, 'not every failure [to tailor jury instructions] is fatal.'" Cotto, 471 N.J. Super. at 544 (alteration in original) (quoting State v. Tierney, 356 N.J. Super. 468, 482 (App. Div. 2003)). "When the facts are neither complex nor confusing, a court does not have to provide an intricate discussion of the facts in the jury charge." Ibid. (citing Tierney, 356 N.J. Super. at 482).

The trial judge instructed the jury on possession of a weapon with a purpose meant to use it unlawfully against the person or property of another. At the end of the instructions, the prosecutor pointed out the judge should have used the term "firearm" instead of "weapon," consistent with the indictment. Because it was late in the day, the judge dismissed the jury, and told the parties that he would correct the instruction the following morning.

The judge followed suit the next day, advising the jury he mistakenly used the word weapon rather than firearm in the charge. He noted the term "weapon" was on the jury's verdict sheet and that the jury would have the corrected charge

with them in deliberations, but out of "an abundance of caution," re-read the charge on the unlawful weapons possession count with the correct term in it.

Because the defense did not object to the jury charge, we review the instruction for plain error and only reverse if that error was "clearly capable of producing an unjust result." State v. McKinney, 223 N.J. 475, 494 (2015) (quoting R. 2:10-2). An unjust result arises when the error raises a "reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." Taffaro, 195 N.J. at 454 (quoting State v. Macon, 57 N.J. 325, 336 (1971)). Failure to object creates a "presum[ption] that the instructions were adequate." State v. Morais, 359 N.J. Super. 123, 134-35 (App. Div. 2003).

Pursuant to these principles, we conclude the trial judge did not commit a prejudicial error. This is not only because the judge corrected the mistake, but also because the record reflects the jury had no follow-up questions after the court read the proper instruction or during deliberations to help convince us they were somehow confused on this issue.

## VIII.

Points VIII, IX and X challenged the sentence imposed by the trial judge. In point VIII, he challenges the trial judge's weighing of the aggravating and mitigating factors. Under point IX, defendant argues the judge failed to consider

his young age. Additionally, point X challenges the fact consecutive sentences were imposed.

Our review of sentencing determinations is highly deferential. State v. Fuentes, 217 N.J. 57, 70  2014) (citing State v. O'Donnell, 117 N.J. 210, 215 (1989)). The "review of a sentencing court's imposition of sentence is guided by an abuse of discretion standard." Jones, 232 N.J. at 318. We do "not substitute [our] judgment for that of the trial court." State v. Burton, 309 N.J. Super. 280, 290 (App. Div. 1998) (citing State v. Roth, 95 N.J. 334, 365 (1984)). "But the deferential standard of review applies only if the trial judge follows the Code [of Criminal Justice] and the basic precepts that channel sentencing discretion." State v. Case, 220 N.J. 49, 65 (2014). "When the aggravating and mitigating factors are identified, supported by competent, credible evidence in the record, and properly balanced, we must affirm the sentence and not second-guess the sentencing court, provided that the sentence does not 'shock the judicial conscience . . . .'" Ibid. (quoting Roth, 95 N.J. at 365 (internal citations omitted)).

A.

Defendant argues the judge improperly weighed aggravating and mitigating factors, which resulted in an excessive sentence. He asserts the court

90

"downplay[ed]" his mental limitations and "highlighted" certain hearsay facts when it weighed the factors. Defendant contends the court's application of aggravating factor three was inappropriate because his mental limitations made it difficult for him to express emotion, including remorse. He claims the findings under aggravating factor nine were flawed because the judge "did not address how deterrence applies in the context of an autistic sixteen . . . year old boy."

As for the mitigating factors, defendant argues the judge did not give enough weight to mitigating factors three and four by considering that he acted under a strong provocation and giving enough consideration to his mental health issues. The judge did not give enough weight to mitigating factors eight and nine. Defendant maintains the judge did not give enough weight to mitigating factor fourteen, and instead focused on the nature of his crimes rather than considering his youthfulness.

"The general deference to sentencing decisions includes application of the factors set forth in N.J.S.A. 2C:44-1(a) and (b): appellate courts do not '"substitute [their] assessment of aggravating and mitigating factors" for the trial court's judgment.'" State v. Miller, 237 N.J. 15, 28-29 (2019) (alteration in original) (quoting State v. Miller, 205 N.J. 109, 127 (2011)). "Permitting

appellate courts to substitute their factual findings for equally plausible trial court findings is likely to 'undermine the legitimacy of the [trial] courts in the eyes of litigants, multiply appeals by encouraging appellate retrial of some factual issues, and needlessly reallocate judicial authority.'" Id. at 29 (alteration in original) (quoting S.S., 229 N.J. at 380-81).  "[T]he public's interest in 'stability and judicial economy' is promoted by designating our trial courts, rather than appellate courts, as 'the finder of the facts,' in the absence of clear error."  Ibid. (alteration in original) (quoting S.S., 229 N.J. at 381).

The trial judge gave significant weight to aggravating factor one, the nature and circumstances of the offense, N.J.S.A. 2C:44-1(a)(1).  He noted defendant fired an excessive number of shots and did so continuously as the victims were already on the ground "completely helpless."  The judge also discussed, but did not give significant weight to the magnitude that defendant's crimes had on the survivors, namely, defendant's brother and girlfriend.

The trial judge also gave aggravating factor three, the risk defendant would commit another offense, N.J.S.A. 2C:44-1(a)(3), significant weight.  As evidence of the re-offense risk, the judge quoted defendant, who remarked to evaluators that he "'feels something like this would happen again or worse,'" "his brain is 'getting split,'" and "that his violence could spread."  Defendant also

said, "the other part of me knows the consequences now and will more carefully plan out better how to cover [my] tracks." The judge noted defendant "stated that on the night of the offense, he had planned to go out of the house and kill a neighbor who had bullied him." He concluded "[d]efendant's own admissions and the overall lack of finding of psychiatric causes for this incident, indicate that . . . defendant's actions were guided by his own evil desire and potential vindictiveness. This evidence supports a finding that . . . defendant is a risk to commit future offenses."

Defendant also lacked remorse, which the judge described as follows:

> In this matter, defendant explained to the police just hours after the killings that he should feel sad but he had no feeling about what he has done. He has now had five years almost to think about what he has done. He has seen the trial. He has watched the witnesses. He has felt the impact of everything that he has done. He listened to the impact statements here today. And when given the opportunity to say something, he has nothing to say.

The judge found aggravating factor nine, the need for deterrence, N.J.S.A. 2C:44-1(a)(9), and gave it significant weight. He reasoned general deterrence was warranted because the quadruple murders and weapons offenses were serious. Specific deterrence was necessary because defendant told investigators "what he did and that it was wrong." Even with this understanding, defendant

needed to be deterred because "he wants to chronicle a book about himself called Scott Free that . . . talks about ways of getting out of it in the future and not getting caught; and . . . [wants to] learn[] better [for] the next time to cover his tracks." The judge concluded it was clear "defendant if given the opportunity would strike again."

The trial judge found that "despite multiple evaluations, defendant's competence has never been questioned. Defendant's own desires and choices guided his actions, not any mental deficiency." Rather "defendant acted out of retaliation for what he felt were wrongs committed upon him. And because there's still people in this world that he feels had wronged him, including the neighbor and others, . . . there is a specific deterrence to this defendant from violating the law in the future."

The trial judge found aggravating factor twelve, N.J.S.A. 2C:44-1(a)(12), applied because defendant murdered his grandmother who was over sixty years of age. He gave the factor "some weight" because defendant knew the grandmother's age because of her relationship with his grandfather.

The trial judge gave mitigating factor four, N.J.S.A. 2C:44-1(b)(4), that there were substantial grounds tending to excuse or justify the defendant's conduct or failing to establish a defense, "some weight." According to the judge,

94

"at most" defendant had autism spectrum disorder, but it did "not . . . justif[y] defendant's] conduct under these circumstances."

Mitigating factor seven, N.J.S.A. 2C:44-1(b)(7), defendant's lack of criminal history, also applied. However, the judge gave this factor "limited weight" because the lack of criminal history was mostly due to defendant's age.

The judge accorded mitigating factor twelve, N.J.S.A. 2C:44-1(b)(12), willingness to cooperate with law enforcement, "minimal weight." He noted although defendant surrendered to police at the scene, he did so only "because he didn't want to get shot." And even though defendant gave investigators a statement he minimized his responsibility in the killings.

Mitigating factor fourteen, N.J.S.A. 2C:44-1(b)(14), applied because defendant was under the age of twenty-six when he committed his crimes. The trial judge gave the factor "some weight" reasoning "[e]ven though [defendant's] young in age, which is a number, he's not young in his evil intent on the day that he committed these offenses."

The trial judge concluded the aggravating factors outweighed the mitigating factors. He sentenced defendant to consecutive terms, which totaled to an aggregate term of 150 years imprisonment subject to the No Early Release Act, (NERA), N.J.S.A. 2C:43-7.2, and the Graves Act, N.J.S.A. 2C:43-6.2.

Having considered the record in light of the controlling law, we conclude the judge did not abuse his discretion in weighing the aggravating and mitigating factors. We decline to second guess his balancing of the factors.

B.

Defendant argues the trial judge failed to consider his youth and misapplied the Miller factors. He asserts the "imposition of an aggregate sentence of one hundred and fifty years to a mentally ill sixteen-year-old boy is grossly excessive, shocks the conscious and is contrary to everything discussed in Miller, Zuber and Comer."[7]

Defendant claims the judge did not consider the fact his mother rebuffed his request for mental health treatment. Instead, defendant contends the judge relied solely on the nature of his offenses. The trial judge also failed to consider the fact his brother left a loaded assault rifle next to his bed. The judge mischaracterized what defendant told investigators about his dog. Contrary to what the judge found, defendant argues he said "he wouldn't have shot his dog and that he liked his dog."

Defendant asserts the trial judge misapplied the Miller factors because the State's case was not strong and relied heavily on his confession. Yet, throughout

---

[7] State v. Zuber, 227 N.J. 422 (2017); State v. Comer, 249 N.J. 359 (2022).

the trial, there was evidence defendant was incapable of assisting in his defense because of his youthfulness. Contrary to the judge's findings, defendant was not involved in the plea negotiations, and the judge should have considered his lack of capacity at sentencing.

According to defendant, the trial judge relied heavily on his lack of remorse, without considering his mental limitations, his difficulty in expressing emotion, and handling of social interactions. He argues "it would've been difficult if not impossible for [him] to give a speech before a [c]ourtroom full of people at his sentencing."

In Comer, our Supreme Court noted Miller, banned "life-without-parole sentences for juveniles to homicide offenses." 249 N.J. at 386 (citing Miller, 567 U.S. at 465). The Zuber Court "extended Miller to sentences that are the practical equivalent of life without parole." Id. at 388 (citing J.R., 227 N.J. at 429). Zuber "requires judges to evaluate the Miller factors before sentencing juveniles to a lengthy term of parole ineligibility." Ibid. Those factors require sentencing judges to consider the following:

> [A juvenile's] chronological age and its hallmark features-among them, immaturity, impetuosity, and failure to appreciate risks and consequences. . . . [T]he family and home environment that surrounds [them]- and from which [they] cannot usually extricate [themself]-no matter how brutal or dysfunctional. . . .

[T]he circumstances of the homicide offense, including the extent of [the juvenile's] participation in the conduct and the way familial and peer pressures may have affected [them]. . . . [Whether the juvenile] might have been charged and convicted of a lesser offense if not for incompetencies associated with youth-for example, [their] inability to deal with police officers or prosecutors (including on a plea agreement) or [their] incapacity to assist [their] own attorneys. . . . And . . . the possibility of rehabilitation even when the circumstances most suggest it.

[Zuber, 227 N.J. at 445 (quoting Miller, 567 U.S. at 477-78).]

The trial judge assessed each Miller factor. The judge found the first factor weighed against defendant because "[a]lthough there is evidence that indicates defendant acted younger than his age, defendant did not exhibit immaturity and impetuous[ity] . . . in the commission of his crime." Defendant's actions indicated "thoughtfulness," and highlighted the steps defendant took prior to the commission of the murders. The judge found "[s]uch sophistication goes beyond the characteristics of a youth. These acts that the defendant was involved with are clearly . . . the acts of an evil man with an evil spirit with an intention to kill as many people in his path."

The trial judge found the second Miller factor also weighed against defendant. The evidence showed defendant was loved and part of a "supportive and caring home environment," and "[t]he family was neither dysfunctional nor

brutal." The judge acknowledged defendant did not receive the mental health help he asked for, but "the fail[ure] of his . . . mother and grandfather . . . [to] understand[ his] mental health, does not overcome the rest of . . . defendant's supportive home environment."

The trial judge also referenced the part of defendant's interrogation when he was questioned about his dog. The judge noted the following:

> [Defendant] said [he] didn't shoot the dog because he wasn't doing anything to [him] but if he did, he would have shot the dog also. To me, that's just further indication of this defendant's mindset.
>
> He has a mindset [regarding] a defenseless animal that he even thought about in his mind if the dog did something, then [he] would have taken the dog out too.

The trial judge found the third <u>Miller</u> factor weighed against defendant, because he was the only perpetrator and there was no outside pressure to commit the offenses. Although the weapon should have been secured, "defendant was the sole force in choosing to remove it from the closet, loading it, loading the magazine with [thirty] projectiles, securing the magazine into the assault firearm and pulling the trigger with a five[-]pound pull, not once, not twice, but [fourteen] separate times."

The third <u>Miller</u> factor also did not favor defendant, because there was "no indication the result would have been different had defendant not offered a confession." The trial judge found "no indication . . . defendant's youth made him incapable of assisting his own attorneys." The judge noted he presided over the case and there were plea discussions, yet "there could be no agreement under these circumstances so . . . defendant was involved in discussions with his attorney."

The trial judge found the fifth <u>Miller</u> factor "slightly weighs in defendant's favor." He noted that since the offenses, defendant had performed well in his schooling, had no disciplinary infractions, and was attending college classes. However, the judge reiterated defendant "knew killing was wrong at the time of the crime," and defendant showed no remorse. The judge concluded that "[a]t this juncture, this [c]ourt does not find . . . a significant possibility of rehabilitation."

The record amply demonstrates the judge did not misapply the <u>Miller</u> factors or abuse his discretion. We affirm substantially for the reasons expressed in the trial judge's findings and add the following comments.

The first <u>Miller</u> factor did not favor defendant because there was evidence he planned the murders, suggesting he did not act out of impulse. The murders

100

did not happen simultaneously, which demonstrated defendant acted methodically, choosing whom to kill and whom to spare. Defendant also evaluated the risks and consequences of his actions because he disarmed himself and waited in his bedroom when police arrived. These facts outweighed the limited evidence showing defendant sought mental health treatment presented through his aunt's testimony. The aunt testified she only heard defendant request assistance once, which is contrary to the claim defendant begged for help.

Defendant's request for help also did not outweigh the evidence presented under the second Miller factor, which showed defendant had a loving, supportive family. Defendant's mother made him special dinners, and the brother who witnessed the killings let defendant win basketball games.

The fourth Miller factor did not favor defendant because the evidence did not support the claim his confession was due to his inability to deal with the detectives. As we noted at the outset, the video of defendant's statement to investigators showed he freely, knowingly, and intelligently waived his Miranda rights and had little difficulty speaking with investigators. There was no evidence defendant was incapable of assisting his attorneys. He was cooperative and pursued an insanity defense, which precluded a plea agreement.

The judge's decision to give the fifth <u>Miller</u> factor slight weight was sound given defendant's accomplishments in prison. We reject defendant's assertion the judge faulted defendant because he could not speak in front of a courtroom of people. The judge's findings centered around the fact defendant showed no remorse during the five-year span of this case.

## C.

In point X, defendant argues the trial judge erred when he imposed consecutive sentences. He asserts his offenses constituted one period of aberrant behavior. Defendant also claims the judge failed to mention his mental health or the evidence suggesting he was in a dissociative state at the time the crimes were committed. He alleges there was no evidence to support the court's finding the motive for shooting his parents was because of a potential school transfer.

When the imposition of consecutive terms is challenged, we must ensure the principles set forth in <u>State v. Yarbough</u>, 100 N.J. 627, 643-44 (1985), were correctly applied. <u>Yarbough</u> recognizes that "there can be no free crimes in a system for which the punishment shall fit the crime." 100 N.J. at 643. To ensure compliance with that central theme, a judge must separately state the reasons for consecutive terms in the sentencing decision, and, in reaching a conclusion, the judge must consider whether:

(a) the crimes and their objectives were predominantly independent of each other,

(b) the crimes involved separate acts of violence or threats of violence,

(c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior,

(d) any of the crimes involve multiple victims, [and]

(e) the convictions for which the sentences are to be imposed are numerous.

[Id. at 644.]

In cases involving juveniles, these traditional Yarbough considerations must be examined under "a heightened level of care." Zuber, 227 N.J. at 449. This means the "concerns that Graham[8] and Miller highlight" maintain "overriding importance." Id. at 450.

The trial judge found defendant's crimes and objectives were independent of each other because "defendant shot his mother and father for a single purpose. He was not happy with the fact that he was going, the issue with his schooling and where he was going to go to school." The shootings of the grandmother and

---

8 Graham v. Florida, 560 U.S. 48 (2010).

the sister "were independent [of] each other[,] having its own purpose."  The

judge reasoned as follows:

> Defendant first killed his mother after waiting for her with the lights off.  In a short period of time thereafter, defendant shot his father.
>
> Instead of discontinuing his actions, defendant left the room, . . . went down the . . . [thirteen] or [fifteen] steps.  He then made another left turn, another [thirteen] to [fifteen] steps and he made consci[ous] choices.  At first, he decided to take his sister out which was a separate motive than what he had for [his grandmother].  He fired at her and he killed her.
>
> He then had a break in his decision[-]making process.  He stopped when it came to his grandfather, made the conscious choice not to shoot him.  That breaks the event from the shooting of [his sister] to then turning the gun onto [his grandmother].  That is significant to this [c]ourt in the Yarbough analysis. [D]efendant then points the gun at his grandmother and decides to fire again.  That is another separate distinct act . . . with a separate motive because according to . . . defendant, he did not believe that his grandfather liked [his grandmother] anymore.

The trial judge sentenced defendant to four maximum custodial terms of

fifty years, subject to NERA and Graves Act parole disqualifiers.  He ran

defendant's sentence on the murder of his father (count two) concurrently to his

sentence on the murder of his mother (count one).  The sentence on the murder

of his sister was run consecutive to count one.  And the sentence on the murder

of his grandmother (count four), was run consecutive to counts one and three. In aggregate, defendant's sentence was 150 years, subject to the parole disqualifiers. In real time, the sentence equated to 127 years, six months, and four days before defendant would become parole eligible. The trial judge emphasized his intention was that "defendant never sees the light of the outside of a jail cell ever again."

The trial judge's Yarbough analysis was thorough and cognizant of defendant's status as a juvenile. We affirm substantially for the reasons he expressed and add the following comment.

Regardless of whether it was defendant's motive to kill his parents due to his upset regarding switching schools, there was ample evidence to support the finding his crimes and objectives were independent of each other because of the breaks in between the shootings. The record also supports the conclusion defendant made deliberative decisions regarding which members of the family to kill.

IX.

Finally, to the extent we have not addressed an argument raised on the appeal, it is because it lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3753-21